CHEMICAL BANK, Plaintiff,

v.

AFFILIATED FM INSURANCE
CO., Defendant.

Nos. 87 Civ. 0150(MP), 87 Civ. 1537(MP),
87 Civ. 0835(MP), 87 Civ. 0151(MP), 87
Civ. 1538(MP), 87 Civ. 0153(MP), 87 Civ.
4524(MP).

United States District Court,
S.D. New York.

July 18, 1997.

**308**

Zalkin, Rodin & Goodman, New York City, for plaintiff Chemical Bank.

Winston & Strawn, New York City, for plaintiff NatWest Bank National Ass'n.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs Banque Paribas, Eu-ropean American Bank and Rabobank Ned-erland.

Lloyd D. Feld, Armonk, NY, for plaintiff Andina Coffee, Inc.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff American Ex-press Bank Ltd.

Podvey, Sachs, Meanor, Cattenacci, Hild-ner & Cocoziello, Newark, NJ, for defendant Affiliated FM Ins. Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### OPINION AND FINDINGS

MILTON POLLACK, Senior District Judge.

This action was tried at a Bench Trial before the Honorable Milton Pollack, United States Senior District Judge, without a jury on May 12, 1997, May 13, 1997, May 14, 1997, May 15, 1997, May 16, 1997, May 19, 1997, May 20, 1997, May 22, 1997, May 23, 1997, May 27, 1997, May 28, 1997, May 29, 1997, May 30, 1997, June 2, 1997 and June 3, 1997; and this Court having heard and seen the witnesses, and having received and ruled on the exhibits proffered by the parties and having received deposition designations of the parties at hearings held on June 4, 1997 and June 5, 1997; and this Court having evaluated the testimony of witnesses, and having considered the documents received in evidence, and having reviewed the deposi-tions, in whole or in part, as designated by the parties, and due deliberation having been had, reports the same in its Opinion and Findings and expresses its Conclusions, as follows.

This decade-old insurance policy dispute stems from the fraud perpetrated by a Co-lombian coffee exporter, Gonchecol Ltda. ("Gonchecol"), against a United States im-porter ("Andina")[1] and six financing banks

1. The coffee importer is Andina Coffee, Inc. and   its subsidiary, Andina Trading Corp. (collectively

(the "Banks"),[2] which caused losses in 1986 totalling over $94,500,000. Gonchecol presented fraudulent truck bills of lading as draw documents in order to obtain payment on letters of credit provided by the Banks to their customer Andina. At the outset of these consolidated actions, the Banks and Andina brought claims against two insurance companies—Affiliated FM Insurance Company ("Affiliated") and Lloyd's of London ("Lloyd's" or the "London Insurers")—to recover under open cargo marine insurance policies and against two insurance brokers— Trinder & Norwood and Hogg Robinson Ltd. and Hogg Robinson & Gardner Mountain Ltd. By 1993, all the defendants except for Affiliated negotiated settlements with the Banks. In this action, the Banks seek to recover $44,174,000 together with pre-judgment interest from January 1, 1987 arising under forty-eight letters of credit drawn or paid prior to March 21, 1986.

Plaintiffs base jurisdiction under 28 U.S.C. § 1332. Defendant Affiliated is a citizen of Rhode Island. Each of the plaintiffs, at the commencement of the actions, was a citizen of a state other than Rhode Island or a nation other than the United States and had its principal place of business in New York.

The unique commercial context and drawn-out prelitigation history is as follows.

## I. The Parties and Their Commercial Dealings

The Echeverris, Colombian nationals, owned and controlled Gonchecol and other coffee businesses in Colombia. These businesses—Gonchecol, Goncheverri and Gonchelopez (collectively the "Gonche Group")—exported sizable quantities of coffee to the United States, Europe, and Japan during the 1970s and 1980s up until the fraud.[3] The Gonche Group represented one of two of the largest private exporters of coffee in Colombia.[4] Julian Echeverri directed the Echeverri family enterprises; his nephew, Ruben Echeverri ("Ruben" or "Echeverri"), ran the day-to-day operations of Gonchecol. Bank files on Andina reveal that the Gonche Group also held large interests in banking,[5] textiles, cattle ranching and other industrial enterprises and its owners were well connected in Colombia.[6] The Banks believed the Echeverri family to be a leading family in Colombia, and well regarded in the political and business community.[7]

In 1974, the Echeverris, along with several other Colombian coffee-exporting families, established Andina Coffee, Inc. in New York, New York[8] to serve as its agent and to facilitate the importation of coffee into the United States. Subsequently, in order to minimize the exporters' taxable income in the United States, the ownership of Andina's stock shifted from the founding individual shareholders to three Panamanian corporations, in which the Echeverris held a minority share.[9] In 1983, Andina Coffee, Inc. formed Andina Trading Corporation as a wholly-owned subsidiary. Andina Coffee derived its income from commissions on the sale of coffee and from financing charges imposed on the exporters. Andina Trading

"Andina").

2. The plaintiffs are: Chemical Bank (now known as The Chase Manhattan Bank) ("Chemical"); Banque Paribas ("Paribas"); American Express Bank Ltd. (formerly known as American Express International Banking Corporation) ("American Express Bank" or "Amex"); NatWest Bank N.A. (now known as Fleet Bank, N.A.) ("NatWest"); Cooperative Centrale Raffeisenboerenleenbank B.A. ("Rabobank"); European American Bank ("EAB") (collectively the "Banks"); and the plaintiff Andina.

3. *See* Ocampo, Plaintiffs' Deposition Designations, at 1235; *see also* Sahyoun, Defendant's Deposition Designations, at 130 (referring to sales to Europe by Andina).

4. Tr. at 21 (Gleason testimony); Pls.'s Ex. CH 39.

5. Pls.'s Ex. 43 at 305275.

6. Pls.'s Ex. 41 at 703029.

7. Pls.'s Ex. 43 at 305278.

8. Canal, Plaintiffs' Deposition Designations, at 16.

9. Tr. at 1012 (Kessler testimony); Echeverri deposition, at 602 (stating that due to tax matters and upon the recommendation or advise of Kessler and Canal, the Echeverris decreased their shares to own less than fifty percent of the Panamanian companies).

**310**

Corporation derived its income from profits in the sale of coffee.[10]

At the time of the discovery of the fraud in 1986, Andina was the largest importer of Colombian coffee into the United States and enjoyed a strong reputation in terms of delivery, quality, and reliability.[11] Humberto Canal and Dennis Kessler managed Andina: Canal served as the chief operating officer;[12] Kessler served as its chief financial officer.[13] Based on between five and ten years of profitable collaborative experience, which was described as "increasingly close and

open," the Banks knew Andina's management well and regarded them highly.[14] Canal and Kessler enjoyed over a long time solid reputations in the industry as reliable, respected and trustworthy merchants.[15] Julian Echeverri, Ruben Echeverri and Hernan Lopez—all original individual owners of Andina—at various times, also served as officers of Andina[16] and members of the board of directors.[17]

After Gonchecol contracted for a sale of coffee to roasters in the United States,[18]

10. Tr. at 1007 (Kessler testimony).

11. Tr. at 295 (Nead testimony).

12. Canal, Plaintiffs' Deposition Designations, at 16–17.

13. Tr. at 1006 (Kessler testimony).

14. *See, e.g.*, Pls.'s Ex. 43 at Z112061 (describing the relationship between Chemical Bank and Andina as "increasingly close and open"); Pls.'s Ex. 49–8 at C005393–94, C005398 (describing officers' impressions at Paribas, NatWest, and Chemical Bank that their respective banks held Andina's senior management in high regard, and concluding that American Express likewise held Andina's senior management in high regard).

15. Pls.'s Ex. 43 at 305278.

16. Tr. at 1015–16 (Kessler testimony) (noting that these officers did not engage in Andina's day-to-day operations but rather provided consulting and advisory services in Colombia regarding the coffee market).

17. Kessler testified that the principals of the Colombian exporters never constituted a majority of Andina's board of directors. Tr. at 1012–13.

18. *The typical transaction underlying the commercial relationship between the Banks, Andina, and Gonchecol was as follows.* Gonchecol would contract for a sale of coffee with a United States roaster. *Gonchecol would then request that Andina arrange for a documentary letter of credit to be opened in its favor.* The letter of credit was payable on presentation of inland documents *consigned to one of the Banks. Once the Bank opened the letter of credit, Gonchecol would register the sale of coffee with the Central Bank of Colombia and the National Federation of Coffee Growers of Colombia (the "Federation").* The letter of credit evidenced the importation of dollars and served as a prerequisite for a license to export. Gonchecol would then purchase *the coffee, which would be transported to*

one of its mills for processing. The Federation would inspect the coffee and, if approved, issue a document called the "Revision," which specified the quantity of coffee and assigned a lot number. Gonchecol would then arrange for the coffee to be shipped from the mill to the port. The trucker would issue a truck bill of lading, which would in turn be presented to the advising bank, and the letter of credit would be drawn upon. Andina would then incur a loan chargeable against its line of credit with the Bank, and would begin charging interest to Gonchecol. The trucker would transport the coffee from the interior to the port for shipment, usually in convoys and with military escort. Once at the port, the Federation would inspect the coffee again and the coffee would be consigned to the port *forwarder for shipment to the United States.* The Bank would hold the interior documents as collateral for the loan (usually with a maximum tenor of between 45 and 60 days) until receipt of the ocean bills of lading. *Upon issuance of the* ocean bills of lading, Gonchecol would courier the bills of lading to Andina in New York, Andina would present the bills to the Bank for endorsement, and the Bank would release *the document* to Andina on trust receipt (usually for a maximum of 60 days). Andina would then arrange for the coffee to clear customs, and would present the coffee to its customer. *Once the roaster* took possession of the coffee and made payment, Andina would repay its corresponding portion of the loan. Pls.'s Ex. Ch 43 at 305276; *see also* Pls.'s Ex. Ch. 4 Exhibit A.

The mechanics of the letter of credit transaction were as follows. Upon request from Gonchecol, Andina would contact the Bank's account officer to apply for a letter of credit. The account officer would check Andina's line of credit. If adequate, Andina would submit a letter of *credit application to the Bank's letter of credit* department. Upon receipt of such applications, the letter of credit department would examine the application, for information such as the corresponding or advising bank and relevant dates. Once the letter of credit department completed its review of the application, it would obtain credit approval from the account officer. The *letter of credit would then be telexed to the*

Andina provided the Gonche Group with financing for the export of coffee from Colombia through documentary letters of credit charged against secured lines of credit established with various United States and European banks.[19] The letters of credit at issue in this case provided that the Colombian exporter, as beneficiary, could obtain payment from a Bank by presenting the following draw documents: a railroad or truck bill of lading; a commercial invoice; and a letter to the port forwarder requesting the preparation of an ocean bill of lading to the order of the financing bank. Correspondent Colombian banks forwarded the draw documents to the financing banks, which in turn advanced the funds. As a general rule, Andina did not receive copies of the truck bills of lading or other draw documents.[20] This mode of transactional financing enabled Andina to finance the purchase of specified lots of coffee and to repay the letters of credit with the proceeds of the sales of coffee.[21]

Through this asset conversion cycle plaintiff Banks extended hundreds of millions of dollars of credit to Andina, all of which was timely repaid prior to 1986.[22] Up until the discovery of the fraud, Andina proved a reliable and profitable customer of the Banks. Canal and Kessler maintained good relations with the Banks' officers. The Banks' officers maintained in-depth files on Andina and kept abreast of industry developments. While some of the Banks endeavored to improve upon the security underlying the transactional financing—especially in light of the uncommon challenges posed by conducting business in Colombia during the 1980s—on the whole, Andina had established an excellent track record of credit trustworthiness and profitability.

Andina, for its part, profited from its commercial arrangements. Gonchecol had kept up with their shipment obligations. Canal, Andina's president, testified (by deposition) that prior to 1986 Andina did not need to interfere in the manner in which the Gonche Group transported coffee from the warehouses to the ports because they had exported over the years between 13 to 14 million bags without incident. These volumes both impressed and pleased Andina's management.[23] Canal expected Andina to make sizable profits in 1986;[24] and, some of the Banks noted Gonchecol's profitable operations through the first quarter of 1986. In addition, Andina's minutes of its board meetings in September, 1985 and May, 1986 indicate that the Gonche Group hoped to increase its monthly exports to over 130,000 bags, and that Kessler sought additional lines of credit with other banks to augment Andina's available credit to at least $250 million.[25]

## II. The Insurance Policy

As a condition of financing, the Banks routinely obtained through Andina suitable in-

advising bank in Colombia. Tr. at 560–61 (Blanc testimony).

The payment of letters of credit on behalf of Andina required the advising Colombian banks to forward the draw documents to the letter of credit department of the financing Bank. The letters of credit called for draw documents consisting of a railroad or truck bill of lading, a commercial invoice, and a letter to the port forwarder requesting the preparation of an ocean bill of lading to the order of the financing bank. The letter of credit department would inspect the draw documents for compliance with the letter of credit. The department would prepare a document called a turn-down that listed any discrepancies noted, and if any were noted the Bank would contact Andina and inquire whether Andina waived the discrepancies. Upon Andina's waiver, the Bank would accept the documents and make payment to the Colombian bank. Tr. at 562–63 (Blanc testimony).

19. Tr. at 1016 (Kessler's testimony).

20. Tr. at 1017 (Kessler testimony); Canal, Affiliated's Supplemental and Counter Deposition Designations, at 571.

21. Bazin, Affiliated's Supplemental and Counter Deposition Designation, at 10.

22. Tr. at 894 (Oster testimony); tr. at 1019 (Kessler testimony).

23. Canal, Plaintiffs' Deposition Designations, at 950.

24. Canal, Plaintiffs' Deposition Designations, at 1375 (stating that the Gonche Group had been exporting amounts of coffee that corresponded to the credit advanced and that Andina was making a good profit in 1986 prior to the discovery of the fraud).

25. Pls.'s Ex. AND 163–2 at 5; Pls.'s Ex. AND 163–23 at 6 (Andina's board minutes of September 23, 1986) (referring to Kessler's efforts to negotiate lines of credit with additional banks).

surance against false draw documents. Andina obtained a marine open cargo insurance policy issued by Affiliated (the "Affiliated Policy" or "Policy") on July 23, 1980. Each of the Banks was named in the Affiliated Policy as an additional assured as evidenced by separate Banker's Endorsements. The Affiliated Policy expressly extended coverage to losses caused by fraudulent bills of lading, shipping receipts or messenger receipts.[26] In addition, each of the Banker's Endorsements, in relevant part, stated: (1) that the Bank's interest would not be impaired or invalidated by an act or neglect or breach of warranty of Andina; (2) that the Bank must receive 10 days prior written notice of any cancellation; and, (3) that "the policy does not insure against conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assured." [27]

Affiliated did not deal directly with Andina, but rather dealt with Trinder & Norwood, an insurance broker.[28] In the summer of 1985, Affiliated decided to cancel the Affiliated Policy because the Andina account had proven to be unprofitable and contacted Trinder & Norwood about replacing it with another policy. In the fall of 1985, the manager of Affiliated's marine cargo department, David Pemmerl, called Trinder & Norwood to inform them of Affiliated's intention to cancel the policy. Shortly thereafter, on November 27, 1985, Pemmerl sent notice of cancellation for the insurance policy effective March 1, 1986.[29] Pemmerl did not send a copy of the letter to Andina or to any of the Banks.[30] Because Trinder & Norwood feared marketing the Andina account under a notice of cancellation, it asked and Affiliated agreed to rescind the cancellation, and Trinder & Norwood assured Affiliated that it would seek a replacement policy as soon as possible.[31] On February 25, 1986, Pemmerl received a telex from Trinder & Norwood notifying Affiliated that a second insurance policy with Lloyd's of London was placed with their underwriters and became effective as to all shipments made on and/or beginning on and/or after February 25, 1986.[32] Affiliated, however, did not send notice of cancellation to the Banks until March 11, 1986, and under the 10–day prior written notification of cancellation requirement the Affiliated Policy was not cancelled until March 21, 1986.

### III. The Discovery of the Fraud

During the 1980s, among other business endeavors, the Gonche Group constructed a large office building in Cali, Colombia called the Cali Tower. The Cali Tower proved to be an unsuccessful business venture and a financial drain for the Gonche Group.[33] In addition, the Gonche Group looted Gonchecol to cover debts incurred by Goncheverri and Gonchelopez, and Goncheverri's director speculated in coffee futures on the commodities market and thus incurred further debts.[34] Over time, Gonchecol's financial situation grew dire as debts mounted.

26. Affiliated Policy's Clause 37(D) provided that:
   This policy covers loss or damage occasioned through the acceptance by the Assured and/or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts.

27. Each of the Banker's Endorsements provided the following:
   This insurance, as to the interest of the Bank, shall not be impaired nor invalidated by any act or neglect of the named Assured nor by failure to comply with any warranty or condition over which the Bank has no control; and this policy shall not be cancelled nor materially changed as to the interest of the Bank unless 10 days' (in case of war risks coverage only, 48 hours') prior written notice of such change or cancellation shall have been given to the Bank. This agreement shall not extend the said policy to cover any additional risks, it being especially agreed that the policy does not insure against conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assured.

28. Tr. at 1489 (Pemmerl testimony).

29. Tr. at 1499 (Pemmerl testimony).

30. Tr. at 1500 (Pemmerl testimony).

31. Tr. at 1501 (Pemmerl testimony).

32. Tr. at 1509–10 (Pemmerl testimony); Jensen, Defendant's Deposition Designation, at 376.

33. Echeverri, at 211–22 (deposition testimony).

34. Pls.'s Ex. Echv 60 at 1 (Echeverri post-arrest statement dated November 16, 1995); Pls.'s Ex. Echv 58 ¶ 14 (Echeverri post-arrest statement dated October 26, 1995); Pls.'s Ex. Echv 59 ¶¶ 3–

Nonetheless, as noted above, throughout 1985 and into 1986, the Gonche Group sustained a steady rate of coffee exports, and kept up with its asset conversion cycle.[35] In the winter of 1985, Ruben Echeverri requested that Andina increase the amount of available financing in order to augment the exports of coffee.[36] Andina's management imposed as conditions of their securing additional lines of credit that the Gonche Group increase their working capital and that they shorten the asset conversion cycle.

In April, 1986, Canal travelled to Colombia to assist the Echeverris in increasing their working capital. During this trip, Canal discovered that the Gonche Group faced a cash flow liquidity problem, which he attributed to several factors—each of which compounded the other. First, the Colombian peso had undergone a substantial devaluation. Second, the Echeverris had taken out significant loans in dollars, which they were forced to repay with devalued pesos at high exchange rates. Finally, a shift in tax policy, which required exporters to pay an export tax with increasingly greater cash contributions rather than in-kind payments and which moved up the time of payment from the port to the mill, further exacerbated the Gonche Group's cash flow liquidity problem.[37] The Echeverris informed Canal that the requirement to pay ever-increasing portions of the tax in cash—and the Gonche Group's liquidity crisis—were causing delays in the anticipated deliveries of coffee.

Andina held a board of director's meeting on May 19, 1986, at which time Canal discussed the Gonche Group's cash flow liquidity problem and the resulting delays in coffee shipments. Canal assured the Board that the situation in Colombia did not jeopardize Andina's collateral position, and that he believed the liquidity problem to be temporarily resolvable. Canal outlined a plan of the Gonche Group to sell $30 million in hard assets in order to infuse Andina with working capital and to shorten the asset conversion cycle. At the meeting, Ruben Echeverri, a senior executive of Gonchecol and a director of Andina, stated that even if the Banks suspended all the lines of credit, the Gonche Group would nonetheless export all financed coffee. Ruben Echeverri further noted that he had signed a subordination agréement covering all amounts due Gonchecol as unrepatriated earnings.

At this point, Kessler did not notify the Banks that the Gonche Group faced a cash flow liquidity problem. Ruben Echeverri had personally assured the Andina management that the Gonche Group could and would deliver the financed coffee. Because the exporters had always complied with past promises, had met their obligations in a timely fashion, had sustained the necessary export volumes, and had substantial wealth and assets in Colombia, Canal and Kessler trusted that the exporters would resolve the liquidity crunch that they faced.[38]

In late May or early June, 1986, Andina noticed a marked elongation in the cycle with increased delays in the exportation of coffee and repayment of letters of credit. In June and July, Gonchecol's shipments began to lag appreciably,[39] and the exporters requested on at least two occasions that Andina send funds to Colombia. Canal and Kessler declined to do so.[40] Relations between the Gonche Group and Andina's management became strained. Nonetheless, in order to maintain Andina's economic viability, when the exporters asked Andina to request 60–day extensions of payment of Andina's letters of credit coming due, Andina complied. Starting in early July, Andina began to contact and meet with individual financing Banks to discuss the liquidity crunch and to request additional

4 (Echeverri post-arrest statement dated November 17, 1995).

**35.** Canal, Affiliated's Supplemental and Counter Deposition Designations, at 130.

**36.** Tr. at 1019 (Kessler testimony).

**37.** Pls.'s Ex. AND 163–2 (minutes of Andina's board of directors meeting held on May 19, 1986); Pls.'s Ex. AND 163–3; tr. at 1022 (Kessler testimony).

**38.** Tr. at 1023, 1307 (Kessler testimony).

**39.** Canal, Affiliated's Supplemental and Counter Deposition Designations, at 946–47.

**40.** Tr. at 1024 (Kessler testimony).

**314**

short-term financing, which request at least one Bank granted.[41, 42] Chemical Bank, with whom Andina had the largest line of credit, refused Andina's request because its management found the exporters' explanations inadequate. Chemical Bank informed Andina that it needed greater details regarding the changes in the taxes before it would extend credit.[43] Shortly thereafter, the Banks and Andina were quickly overtaken by events.

The Gonche Group failed to sell any hard assets to raise working capital for Andina as promised by Ruben Echeverri at the Andina board meeting of May 19, 1986.[44] As the situation deteriorated, the Banks' officials conferred with one another and confirmed that Andina's loans were due with all the financing institutions. On August 12, 1986, Robert Nead ("Nead"), an American Express bank official, joined Canal in Colombia to investigate the situation.[45] On August 14, 1986, Kessler arranged a meeting of the Banks in New York to discuss potential solutions to the liquidity problem.[46] At the same time, Nead and Canal arranged to meet Ruben Echeverri at Gonchecol's offices in Bogota. At the Bogota meeting, Ruben Echeverri stated that he was in financial difficulty with the Colombian banks, that he had pledged coffee to them, and that approximately 200,-000 bags of coffee financed by the Banks was missing.[47] Ruben Echeverri further stated that because he was in a liquidity crisis and needed money, he had drawn against letters of credit with false documents.[48] Ruben Echeverri's admissions infuriated Canal.[49] Immediately thereafter, Canal and Nead placed two separate conference calls to the

Banks' group meeting in New York at which time they informed the group of Ruben Echeverri's admissions. The attendees, including Kessler, responded to the news of the missing coffee and the fraudulent draw documents with shock and surprise.

At the August 14, 1986 meeting, the Banks decided to send a representative group to Colombia to investigate the situation and determine what steps the Banks could take to identify and secure their collateral. The Banks met in Bogota on August 19, 1986 at a meeting attended by Ruben Echeverri, another employee from Gonchecol, eleven representatives from the financing Banks, and attorneys from two of the Banks' local Colombian counsel. Subsequently, Ruben indicated that twenty people were present. Canal did not attend. In the presence of this large group, Echeverri offered the same explanation for the missing coffee that he had given at the first meeting: he stated that he was in a liquidity crisis due to other business ventures, foreign exchange losses and illiquid investments.[50] Echeverri elaborated that he had borrowed money from Colombian banks, that they sought repayment, and that he presented false truck bills of lading (through a trucking company called Enaltra, which he had previously bought) to draw on letters of credit.[51] At this August 19, 1986 meeting, Nead specifically asked Echeverri whether Andina was aware of the fraudulent draw documents. Echeverri responded that Andina was not aware and complained that Andina was causing him discomfort by pressuring him to deliver coffee, exacerbating his financial difficulties, and risking a financial scan-

**41.** Tr. at 15 (Gleason testimony); Tr. at 164 (Nead testimony).

**42.** Andina's management held a series of meetings in July with the financing Banks.

**43.** Tr. at 15 (Gleason testimony).

**44.** Tr. at 1023 (Kessler testimony).

**45.** Tr. at 167 (Nead testimony).

**46.** Tr. at 1026 (Kessler testimony).

**47.** Tr. at 170 (Nead testimony).

**48.** Tr. at 170–71 (Nead testified that when he asked Ruben Echeverri how the coffee could be

missing Ruben stated "that because [Ruben] was in a liquidity crisis and needed the money, that he drew against bills of lading with ... false documents"). Nead's testimony corroborates Garcia's account of Ruben's explanation for the causes of the crisis immediately after the discovery of the fraud. See Garcia, Plaintiffs' Deposition Designations, at 89.

**49.** Tr. at 171 (Nead testimony).

**50.** Tr. at 177 (Nead testimony).

**51.** Tr. at 178 (Nead testimony).

dal.[52] Canal later expressed anger at being excluded from attending this meeting.[53]

In the events leading up to and after the discovery of the fraud, Andina broke completely from the Gonche Group. In addition to refusing to send further funds to the Gonche Group, subsequent to the discovery of the fraud, Andina placed its liquid assets into an escrow account for the benefit of the Banks. Further, after August, 1986 and on the advice of its counsel, Andina's personnel ceased all direct communications with the Echeverris.

A preponderance of the credible evidence shows that at the very least Echeverri began to present fraudulent draw documents upon becoming financially strapped and desperate and that Andina's management neither knew nor participated in the fraud. Echeverri offered consistent explanations at the August 14, and August 19, 1986 meetings for the cause of the missing coffee—specifically, the Gonche Group's financial difficulties and Gonchecol's subsequent presentation of fraudulent truck bills of lading. At the latter meeting, in the presence of twenty witnesses,

Echeverri not only unqualifiedly exonerated Andina of any wrongdoing but expressed irritation at Andina for "exacerbating" his difficulties. Eyewitness testimony of Canal's reaction to both Echeverri's confession of the fraud and to his exclusion from the August 19, 1986 meeting further support a conclusion of Andina's lack of knowledge of Gonchecol's fraud.

The discovery that 200,000 bags of coffee were missing and that Gonchecol had presented fraudulent truck bills of lading for payment came as a complete shock and surprise to the Banks and Andina's management. Neither the financing Banks nor Andina had any inkling that their moneys had been misappropriated in an age-old type of fraud—through the use of false draw documents to obtain payments of letters of credit. The Banks had enjoyed a close working relationship with a major, reputable, and profitable importer, which in turn had dealt with and trusted its founding principals—members of one of the largest, best respected, and most successful Colombian coffee exporting families.[54]

**52.** Tr. at 179 (Nead testimony).

**53.** Tr. at 180 (Nead testimony).

**54.** Significantly, *Affiliated* at one point in 1991 argued this very point persuasively. In a memorandum of law in support of its motion for summary judgment, *Affiliated asserted:*

The fact that neither Andina nor the financing Banks perceived any risk of fraud on the part of Gonchecol is confirmed by the commercial context of the commodities financing in this case. Andina had the same ownership as the Gonche Group. The Banks knew that Andina and the Gonches were inter-related. The Banks also knew of Andina's role as commission and financing agent for the Colombian exporters, as well as its purpose in minimizing taxable income for the principals. Finally, the Banks kept an abundance of information on file about the various business ventures of Andina's principals and relied upon their wealth and reputation in extending credit.

Andina trusted its principal shareholders completely and never contemplated being defrauded by them. Likewise, the Banks trusted the exporters and relied on the relationship between the exporters and Andina in financing Andina. The Banks also trusted Andina because they had excellent relationships with that company.

As importer, Andina knew that the only risk of non-existent goods must originate with the

exporter. Completely trusting the exporters, its related principals, Andina simply did not believe there was a risk of non-existent goods in its precise factual situation. No reasonable business person would expect an importer in Andina's position to insure against the fraud of its "principals."

Likewise, the Banks would have viewed the risk of non-existent goods—in other words, of the exporter's fraud—as itself nonexistent or highly remote. First, as demonstrated above, the Banks knew of the relationship between the exporters and Andina. The reputation and financial banking of the Gonche Group was used as justification for the Banks to extend credit to Andina and was seen as a mitigating factor to risk. It was well-known that "[t]he Echeverri Group would never let Andina suffer any type of financial difficulty." For example, if a financed shipment did not reach port for any reason, the principals would provide coffee to fulfill their obligation. The Banks did not view fraud on the part of the exporter as a risk of financing, as is evident from their failure to identify this risk in their comprehensive credit analyses. The one Bank which even identified the risk deemed it "unlikely." Thus, the close relationship between the exporters and Andina relieved the Banks, as it would any reasonable commodities financier, of concern about fraud on the part of the exporter.

Second, the Banks trusted Andina because they had excellent relationships with that com-

Another reason why the discovery of the fraud came suddenly, unexpectedly, and unbelievably for the Banks and Andina was because Gonchecol had continued to supply coffee up until May or June, 1986. Andina obtained coffee for its sales to the roasters and used the payments it received therefor to repay the Banks millions of dollars of outstanding letter of credit loans.[55] Moreover, prior to the discovery of the fraud, Andina had experienced similar delays in shipments of coffee. Periodically, Andina's inventory would accumulate in Colombia and its inland portion of the financing cycle would lengthen due to port congestion, strikes, or problems in securing military escorts for the transport of coffee from the mills to the port.[56] For example, in 1983, a protracted dock strike in Colombia caused a buildup of 92 percent of Andina's inventory in Colombia.[57] Not surprisingly, the debacle of 1986 caught the Banks and Andina wholly by surprise.

In the aftermath of the discovery and confession of the fraud, the Banks notified Affiliated of the losses and filed timely proofs of losses. At no time did the Banks conceal any material information regarding the fraud.

## IV. Affiliated's Pre–Trial Conduct

The subsequent chapter of this case concerns the conduct of Affiliated in preparation for trial, specifically its efforts to concoct a defense to the Banks' claims. In 1990, Affiliated retained the firm of Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello ("Podvey, Sachs") as its sole counsel in the instant litigation. As Affiliated readily admitted at trial, at that time, Affiliated had no witnesses to help advance a cognizable defense.[58] Among its numerous attempted theories, Affiliated reasoned that proof of Andina's and the Banks' complicity in the fraud would bar recovery under the Policy's "dishonesty" clause. To that end, between 1990 and 1994, Affiliated engaged in secret, questionable negotiations to induce Ruben Echeverri and his brothers, Luis and Jorge Hernan, to impute to the Banks and Andina knowledge of and participation in the fraud. Affiliated's pretrial strategy, which is summarized below, at a minimum casts doubt on the management's integrity in its attempt to find a cognizable defense.

### A. Affiliated's Activities in 1990

In 1990, as part of its casting about for a defense strategy, Affiliated retained an inves-

pany. The accounting documents supplied to the Banks by Andina to demonstrate its stability and net worth provided the Banks with confidence in the security of transactions with Andina.
Tr. at 2318–20 (citing Affiliated's Mem. Supp. Summ. J., May 3, 1991 at 59–61.) The memorandum concluded that "[t]he commercial reality in this case is that reasonable business persons in the positions of either the importer or the financing banks would not perceive any risk of fraud on the part of the exporter." *Id.* at 61.

55. For example, American Express Bank—like many of the other Banks—experienced a sudden onset of slow notes and loans past due from Andina. On July 10, 1986, at the time of Andina's 60-day request for extension of credit, 70 percent of Andina's outstanding loans had been outstanding for less than 150 days. Pls.'s Ex. 52 at 0004308. In addition, up to that point, Andina had repaid 15 letters of credit making payments totalling $12,750,700 in 1986. Pls.'s Ex. 15–b (showing that Andina repaid the 15 letters of credit in 1986 as follows: four in January; two in January and February; four in February; two in March; one in April; one in April and May; and one in June and July). These letters of credit had been opened between June 27, 1985

and February 26, 1986; the average length of time between the opening of the letter of credit and Andina's repayment was 4.6 months or approximately 138 days. Pls.'s Ex. 15–b. The maximum tenor of the financing cycle was 150 days at the time of the discovery of the fraud. Tr. at 218 (Nead testimony). American Express Bank eliminated a sublimit of $5 million on inland financing in 1984; thereafter, American Express Bank did not monitor the intervals within the financing cycle. Ex. 49–2; tr. at 879 (Oster testimony).

56. Tr. at 293 (Nead testimony).

57. Pls.'s Ex. 49–6 at 005443; *see also* Pls.'s Ex. CH 41 at 703029; Pls.'s Ex. CH 42–a.

58. Lead counsel emphasized repeatedly during his summation that Affiliated had no witnesses, tr. at 2357, 2360, and that as a last resort Affiliated "investigated" this claim by going to Colombia. Tr. at 2361 (stating "[s]o the only place and the only way that this insurance company could possibly investigate this claim was to go to Colombia … [and] we did because we had no choice").

tigator named Josiah Thompson ("Thompson") to conduct research related to the coffee business and this case in Colombia. He allegedly spent months interviewing unnamed sources. While in Colombia, Thompson repeatedly contacted the Echeverris' counsel, Juan Parada ("Parada"). Thompson sought and failed to arrange for Affiliated to meet with the Echeverris, but succeeded in obtaining a memorandum from Parada, which responded to questions Thompson had posed to the Echeverris.[59] In violation of its pretrial discovery obligations, Affiliated did not disclose to the Banks or Andina either Thompson's contacts with Parada or Parada's memorandum; several years later Affiliated was finally compelled to make the requisite disclosures of its activities.

### B. Affiliated's Activities in 1992

In 1992, Thompson contacted Parada again to renew Affiliated's efforts to interview the Echeverris.[60] On May 13, 1992, Thompson and a Podvey, Sachs attorney named Michael O'Kane ("O'Kane") met Parada in Bogota. At the meeting, Thompson specifically stated that he "wanted Kessler." Andina by that time had been destroyed by Ruben Echeverri's fraud; the flourishing coffee importation business and Kessler long since were gone. Little further damage could result from making Ruben a turncoat as to Andina, for a price. O'Kane and Thompson proposed that the Echeverris should collaborate with the insurance company by "cooperat[ing] fully in debriefings"[61] and in exchange Affiliated would take measures in an attempt to obtain immunity for the Echeverris from state and federal prosecution in the United States for the host of matters overhanging them, including bank fraud.[62][63] After the meeting, Thompson and Parada arranged for a meeting of Affiliated's representatives, including

their counsel, with Ruben and his brothers in Panama City, Panama. The Echeverris had been advised by Affiliated's representatives that a meeting should not be conducted on United States' soil. Affiliated disclosed none of these contacts to the Banks or to Andina until compelled to do so by the Magistrate Judge assigned to this case.

For two days, on June 3 and 4, 1992, Affiliated's representatives, including their lawyers, accountants, investigators, and sundry personnel met with Ruben, his brothers, and Parada in Panama City, Panama. Affiliated's counsel elected to obtain a Court Reporter from his home base in New Jersey, to accompany counsel to Panama to record in detail the interview sessions, which the Court Reporter did. At the conclusion of the two-day session, Affiliated's counsel instructed the Court Reporter to prepare only one copy of the transcript of her notes and to destroy her notes. She complied with the instructions. Affiliated knew, of course, that Ruben was the only witness who could testify to his fraud and who had knowledge of it. Although this lawsuit was in full progress at the time, Affiliated's representatives gave no notice to the plaintiffs of the two-day interview or the destruction of the record thereof.

A second meeting for another interview was then arranged to convene in Key Biscayne, Florida, despite Affiliated's advice to the Echeverris to stay out of the country. Affiliated followed the same procedure as before. Affiliated brought along the Court Reporter from New Jersey; she took the notes of the interview and was given the same instruction—to deliver one copy to counsel and to destroy her notes. She did.

At each meeting, remarkably considering what was at stake and promised to the Echeverris for their input, Ruben made clear, if it had been missed before, that the

**59.** Thompson, Affiliated's Supplemental and Counter Deposition Designations, at 148.

**60.** Thompson, Affiliated's Supplemental and Counter Deposition Designations, at 148.

**61.** Thompson, Affiliated's Supplemental and Counter Deposition Designations, at 164.

**62.** Thompson, Affiliated's Supplemental and Counter Deposition Designations, at 164 (testifying that "it was made clear to Mr. Echeverri that

his statement would be used for two purposes[:][o]ne was in this particular civil action and the other was in discussions ... with law enforcement to obtain immunity").

**63.** Ruben Echeverri's younger brother, Luis Echeverri, faced immigration and tax problems in the United States.

Banks had had no knowledge of Ruben's fraudulent activity and that he could not provide Affiliated with any documentary evidence to the contrary. As to the defunct Andina, he was willing to say that Andina's officers knew Ruben had manufactured false truck bills of lading. Nonetheless, Affiliated's representatives continued insistently to condition assistance with obtaining immunity from criminal prosecution on Ruben's inculpating the Banks.[64]

After the Florida meeting, O'Kane or Thompson, or both, prepared a statement for Ruben's signature. On August 26, 1992, Ruben travelled to the New Jersey offices of Podvey, Sachs to sign it in exchange for the promised help on the immunity effort.

Affiliated's counsel represented that he then destroyed his copies of the transcripts of the interviews. Counsel explained his actions with respect to the instructions to the Court Reporter and his destruction of the transcripts by stating that this was his practice for every witness interview that was followed by a sworn statement. Counsel added that he had given the Court Reporter those instructions at the time she was retained and prior to his knowing the substance of the interview.

Also in August, 1992, Thompson and O'Kane met again with Luis Echeverri in Cali, Colombia. In fact, between 1990 and approximately 1993, Thompson and O'Kane met with Ruben Echeverri between five and ten times in Colombia.[65] At these meetings, O'Kane always stressed that the only way the Echeverris could obtain immunity would be by accusing Andina and the Banks of knowledge of the fraud that Ruben had perpetrated.[66] Affiliated's representatives did not disclose the extended, recorded meetings they had with the Echeverris, the pressures imposed to procure inculpatory statements from them, or the destroyed transcripts taken over three days from their most significant witness, discovery rules *non constat.*

In October or November, 1992, Affiliated's counsel, without notifying Andina or the Banks, met with the Manhattan District Attorney's office ("Manhattan D.A.") and alleged that some of the plaintiffs, their *officers and counsel* had committed criminal offenses. To support its charges, Affiliated provided the Manhattan D.A. with the proffers of the signed Echeverri statements in order to instigate a criminal investigation of the Banks, Andina, their officers and counsel for plaintiffs. Affiliated also disclosed documents and testimony subject to a confidentiality order of Judge Broderick of this Court who was administering this case at that time, without informing the Manhattan D.A. that such an order was in effect.[67] The Banks and Andina learned of the secret meetings between Affiliated and the Echeverris in February, 1993, when Affiliated filed a motion to amend its complaint and assert a third-party complaint for insurance fraud against the Banks and Andina, their counsel, and several Andina officers. Affiliated's motion was denied. Disclosure of the statements and events at Panama City, Panama and Key Biscayne, Florida did not surface for another year.

## C. Affiliated's Activities in 1993

In the spring of 1993, Affiliated's representatives continued to convene secret meetings with the Echeverris. Affiliated sought to obtain further statements and documentary evidence from Ruben Echeverri implicating not only Andina but also the Banks with knowledge of the fraud. Affiliated persisted in this pursuit even though Ruben Echeverri had previously remained firm in his assertion to Affiliated's representatives that he could not comply because he had no knowledge of—and could offer no documents that showed—any awareness on the part of the Banks of the fraud.[68]

Nonetheless, Parada brought to Echeverri's offices a statement dated May 6, 1993

---

64. Echeverri deposition, at 519.

65. Echeverri deposition, at 530–32.

66. Echeverri deposition, at 531–32.

67. The Manhattan D.A.'s office terminated the criminal investigation of the Andina matter in June, 1993.

68. Echeverri deposition, at 510–13.

("the May 6, 1993 statement"), which implicated the Banks with knowledge of the fraud and which Affiliated had drafted for Echeverri to sign. At the time, Parada indicated that the statement would furnish Echeverri with a "passport" to obtain immunity, and Echeverri signed the statement without reading it.[69] Thus, despite the fact that Ruben was Affiliated's key witness on its contentions that the Banks and Andina knew of the fraud—in direct repudiation of the Banks' and Andina's contentions as to their ignorance of the fraud—Affiliated's representatives prepared this subsequent statement, which charged the Banks' with knowledge of the fraud and which contention Ruben himself had successively disavowed. Affiliated's counsel made no effort at trial to set the record straight on Ruben's disavowal of the Banks' knowledge of the fraud. Affiliated did not disclose to the Banks or Andina any of its dealings with the Echeverris or furnish copies of any of the statements or proffers obtained.

On June 30, 1993, the Manhattan Assistant District Attorney in charge of investigating the fraud notified Judge Broderick that his office had terminated its investigation of the matter. On July 6, 1993, based on this notice and on alleged verbal statements by federal prosecutors in New York and in Florida to Affiliated's representatives that those offices would not investigate the fraud further, Affiliated's lead counsel sent a letter to Parada. The letter concluded that "[t]he result of all this is that your clients are free from any criminal prosecution arising from the events surrounding the collapse of Andina in 1986." [70]

On July 14, 1993, Affiliated gave notice to Andina and the Banks to depose the Echeverris in Cali, Colombia, but continued to withhold the Echeverri statements. The Magistrate Judge assigned to the case ordered the depositions to be held in London, and further ordered Affiliated to produce the written proffers of the Echeverris' statements.

### D. Affiliated's Activities in 1994

Affiliated finally produced to Andina and the Banks copies of the written proffers of the Echeverris' statements on January 18 and 19, 1994. Several weeks later Affiliated produced copies of the signed statements. Approximately ten days before the scheduled depositions in London, Ruben Echeverri and Parada met with Affiliated's representatives in Miami.[71] During this meeting, Echeverri understood that Affiliated again wanted him to testify that both Andina and the Banks knew of the fraud despite Echeverri's prior steadfast denial of any knowledge that the Banks knew of the fraud.[72]

On February 9, 1994, at the Miami airport while en route to London for the deposition, federal agents arrested Ruben Echeverri, who subsequently pleaded guilty to and was convicted of bank fraud. After his arrest, notwithstanding a clear conflict of interest, Echeverri was represented initially by O'Kane and then by a former partner of Affiliated's lead counsel. Eventually, Echeverri retained new counsel. In 1996, while serving two concurrent four-year terms of imprisonment, the parties deposed Ruben Echeverri at a federal prison in North Carolina. Affiliated furnished a video of that deposition, which the Court received for its content and credibility value.

### V. The Banks' or Andina's Alleged Complicity in the Fraud

#### A. The Banks

Affiliated failed to produce a scintilla of evidence that the Banks knew of or participated in the fraud. The evidence overwhelmingly shows that the Banks had no inkling whatsoever, prior to the discovery of the fraud, that Gonchecol created and presented false truck bills of lading in order to draw down on letters of credit. Credible witness testimony indicated, without exception, the Banks' total ignorance of Gonchecol's fraudulent intent and practices. Trial

69. Echeverri deposition, at 432–35.

70. Ch. Ex. "Echeverri Statements" at 1000053 (tab 68).

71. Echeverri deposition, at 509.

72. Echeverri deposition, at 510–13.

exhibits spoke on two sides of the issue making it necessary to evaluate them in light of the other evidence. Moreover, Ruben Echeverri, Affiliated's "primary witness" [73]—except for the highly suspect May 6, 1993 statement, which Echeverri was told was his "passport" to immunity [74]—exonerated the Banks absolutely in every statement he provided to Affiliated prior to his arrest and to law enforcement personnel and to the Banks after his arrest. Following his arrest, Echeverri further acknowledged that, had the Banks known the Gonche Group manufactured false truck bills of lading, the Banks unquestionably would have ceased financing Andina. [75]

### B. Andina

Similarly, Affiliated also failed to present by a preponderance of the credible evidence that Andina's management engaged in "conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assured" regarding any matter covered by the Affiliated policy either through their knowledge of or participation in Gonchecol's presentation of false truck bills of lading or otherwise. Affiliated offered only two witnesses who had personal knowledge regarding Andina's affairs during the time in question: Ruben Echeverri and Mark Rudnick, a computer analyst in charge of Andina's information systems. Both witnesses—either because of their lack of credibility or because of the statements they made at the time of the discovery of the fraud—thoroughly discredit Affiliated's contention that Andina knew of or participated in the fraud.

In his second public statement regarding the Gonchecol fraud, at the August 19, 1986 Bogota meeting, Ruben Echeverri expressly exonerated Andina of any knowledge or wrongdoing related to the fraud. Six and seven years later (on August 26, 1992 and on May 6, 1993), in a desperate and futile attempt to keep Gonchecol viable, in part, by staving off prosecution, Echeverri agreed to collaborate with Affiliated and signed statements implicating Andina. Echeverri's motivations for implicating Andina are various: possibly revenge for Andina's refusal to send moneys immediately before and after the discovery of the fraud; and, possibly a fruitless desire to avoid prosecution and force the United States financing banks to negotiate a commercial resolution to the debacle. The fact that Echeverri continued to implicate Andina following his arrest in no way diminishes his motivation to punish Andina for its assertion of autonomy from the Gonche Group.

Equally important in disproving Affiliated's contrived theory is the testimony of Mark Rudnick. Rudnick served as the director of Andina's computer department starting in the Spring of 1985. [76] Rudnick testified that during his tenure as director of the computer department, even though he had frequent contact with Kessler and was in charge of the computer system that tracked Andina's finance cycle, he never suspected Andina to be involved in a fraud or suspected the Gonche Group of defrauding Andina or the Banks. After Ruben Echeverri's arrest, when interviewed by federal law enforcement personnel, Affiliated's witness, Rudnick, reported that "[t]here was nothing that [he] had ever seen . . . that would raise a red flag in any reasonable person's mind." [77] Similarly, as to the Banks, although the Banks'

---

**73.** Affiliated's Summary of Relevant Deposition Testimony of Ruben Echeverri Taken November 1996.

**74.** See Echeverri, Plaintiffs' Deposition Designations, at 271 (stating that the Banks had no reason to know Gonchecol diverted the proceeds from the letters of credit to other business ventures), 512 (stating that "at any moment I did not know that [the banks] did have knowledge of [the fraud]"); 518 (stating that at the meeting in Panama City on or about June 1992, Ruben told Sachs and his colleagues that he had no knowledge that the banks knew the truck bills of lading were false); 519 (stating that Ruben told Sachs

and his colleagues that he had never been able to find any information to implicate the Banks).

**75.** Pls.'s Ex. Echv 62 at 4 (summarizing meeting with Ruben Echeverri, Chemical Bank's counsel, and representatives of the United States Attorneys' Office held on November 2, 1994).

**76.** Andina utilized a computer system called the Harris computer to track its importation cycle, but many of its management, including Kessler, found it ineffective and cumbersome.

**77.** Tr. at 1693 (Rudnick testimony).

officers supervised the exporters and the Andina account in a relaxed manner, as testified by the Banks' witnesses and as shown in the documentary evidence, the circumstances at the time did not give rise to the level of "red flags in any reasonable person's mind" of fraud by Gonchecol.

Rudnick's testimony at trial and Echeverri's confessions in August, 1986 if taken alone support the conclusion that Andina's management did not engage in any conversion, misappropriation, or dishonest acts by or on behalf of Andina or the Banks.

## ADDITIONAL SPECIFIC FINDINGS

1. Plaintiffs commenced these actions against defendant Affiliated FM Insurance Company for breach of its contractual obligations under an insurance policy entitled "Marine Open Cargo Policy OCP–302" issued by Affiliated to Andina on or about July 23, 1980.

2. At the commencement of these actions each of the plaintiffs was a citizen of a state other than Rhode Island or a nation other than the United States and had its principal place of business within the United States in the Southern District of New York. Defendant Affiliated is a citizen of the State of Rhode Island.

3. The matter in controversy for each of the actions commenced by the plaintiffs exceeds $50,000, exclusive of interest and costs, and this Court has subject matter jurisdiction over these cases based upon 28 U.S.C. § 1332(a).

4. Each of the Banks is named in the Affiliated Policy as an additional assured, as provided in Clause 2 of the Affiliated Policy and in separate endorsements (Nos. 6 (as amended by No. 32), 10, 13, 30, 31 and 34) entitled "Special Terms and Conditions" (the "Bankers' Endorsements").

5. Clause 37(D) of the Affiliated Policy (as amended by Endorsement No. 33, the "FBOL Clause") specifically provides, in a section entitled "Special Conditions," that:

This policy covers loss or damage occasioned through the acceptance by the Assured and/or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts and/or warehouse receipts and/or truckmen's receipts.

6. Each of the Bankers' Endorsements provides, among other things, that:

[T]his policy shall not be canceled nor materially changed as to the interest of the Bank unless 10 days' ... prior written notice of such change or cancellation shall have been given to the Bank.

7. In addition, each of the Bankers' Endorsements provided that each Bank's interest under the Affiliated Policy would not be impaired by any act or neglect of or breach of any warranty by Andina.

8. Clause 15 of the Affiliated Policy provides that if any other insurance is subsequently obtained on the same interest, Affiliated is "nevertheless answerable for the full extent of the sum insured" by it "without right to claim contribution from such subsequent insurers."

9. As a condition of the financing provided by each Bank, Andina was required to maintain suitable insurance and to provide audited and certified financial statements to the Banks.

10. The Affiliated Policy requires that, "[i]n the case of loss or damage, such loss or damage is to be paid in thirty days after proof of loss...."

11. Andina was an United States importer of coffee from Colombia, and, at all relevant times, its business was managed by Humberto Canal and Dennis Kessler.

12. At all relevant times, Gonchecol was an exporter of coffee to Andina and, for most of that time, Ruben Echeverri was one of Gonchecol's principal officers.

13. Each of the Banks (as well as other financial institutions) extended separate secured lines of credit to Andina. Pursuant to those lines of credit, Andina transactionally financed, by letters of credit, its purchases of coffee from Colombian exporters.

14. Andina paid and Affiliated accepted premiums under the Affiliated Policy, including quarterly deposit premiums pursuant to Endorsement No. 17, which deposit premi-

ums were adjusted periodically in accordance with the Affiliated Policy.

15. Between 1974 and up to 1986, the Banks extended hundreds of millions of dollars of credit to Andina (pursuant to letter of credit transactions of the type involved in this action), all of which was timely repaid.

16. In extending financing to Andina, each Bank required Andina to provide it with insurance coverage, and relied upon the insurance obtained by Andina from Affiliated which included, among other provisions, as a special condition, protection for Andina and for each Bank for "loss or damage occasioned through the acceptance by the assured and/or their agents or shippers of fraudulent Bills of Lading and/or shipping receipts and/or messenger receipts and/or warehouse receipts and/or truckmen's receipts."

17. The Banks kept an abundance of information on file about the various business ventures of Andina's principals and relied upon their wealth and reputation in extending credit.

18. Andina trusted its principal shareholders, including Gonchecol, and never contemplated or suspected being defrauded by them.

19. The Banks trusted the exporters and relied on the relationship between the exporters and Andina in financing Andina. The Banks also trusted Andina because they had excellent relationships with that Company.

20. Completely trusting the exporters, its related principals, Andina simply did not believe there was a risk of nonexistent goods in its precise factual situation.

21. It was well known and believed that the Echeverri Group of the exporters would never let Andina suffer any type of financial difficulty.

22. The commercial reality in this case was that reasonable business persons in the positions of either the importer, Andina, or the financing Banks would not perceive or suspect any risk of fraud on the part of the exporter in its relationships with either Andina or the Banks. It was that trust and confidence which motivated the issuance of

letters of credit and enabled the exporter to receive time and indulgence from the Banks and Andina in the slowly elongating cycle of deliveries of coffee during the Spring of 1986.

23. Each letter of credit provided that the Colombian exporter, as beneficiary, could obtain payment from a Bank by presenting certain draw documents (the "Draw Documents"), including truck bills of lading. The truck bills of lading provided apparent confirmation to the Bank of the existence of coffee and the commencement of the export cycle.

24. The Letter of Credit Department of each Bank independently administered and serviced its own letter of credit transactions for the account of Andina. Each Bank's Letter of Credit Department determined whether the Draw Documents for the letters of credit at issue here conformed to the terms of the applicable letter of credit and, when necessary, obtained waivers of discrepancies from Andina before accepting and paying the Colombian exporter in accordance with the letter of credit. Each Bank's Letter of Credit Department accepted the truck bills of lading as Draw Documents prior to payment.

25. No plaintiff disputes that the Affiliated Policy was canceled with respect to Andina for shipments occurring on and after February 25, 1986.

26. Affiliated did not send notice of cancellation of the insurance herein involved to any Bank prior to March 11, 1986, and the Affiliated Policy was not canceled as to the interest of any Bank prior to March 21, 1986.

27. On August 14, 1986, representatives of Andina and the Banks met in New York to discuss possible solutions to a liquidity crisis, which they were told and believed Gonchecol was experiencing. During the course of that meeting, Humberto Canal and Robert Nead (of American Express Bank) called from Colombia to inform the group assembled in New York that approximately 200,000 bags of coffee financed by the Banks through letter of credit payments made between January, 1986 and June, 1986 had not been located.

28. At a meeting in Colombia on August 19, 1986, in the office of a local attorney

attended by representatives of Chemical Bank, American Express, NatWest and Gonchecol, and others, in all, over 20 persons, whereat Ruben Echeverri admitted that the truck bills of lading prepared by Gonchecol and Ruben and utilized by Ruben to draw payment on the letters of credit issued by the Banks were false and fraudulent in that the coffee referenced in such truck bills of lading was not in the possession of either the trucker or the port forwarder. Echeverri further stated that Andina was not aware of and did not participate in the fraud and had no knowledge thereof. He had made a similar disclosure as to the use of fraudulent truck bills of lading to a Bank representative on August 14, 1986.

29. Prior to August 14, 1986 neither the Banks nor Andina knew of the fraud perpetrated upon them by Ruben Echeverri and Gonchecol.

30. A discrepancy between the truck bills of lading and the actual coffee shipped by Gonchecol and Ruben Echeverri began to raise questions with Andina and the Banks in the Spring of 1986. By May, 1986 questions raised by them were discussed at the meeting of Andina's board of directors and purportedly were explained by Ruben as due in part to traffic jams at the port of embarkation, as involved in a money stringency of the exporters due to gyrations in the value of the peso and as due to the burden of export tax regulations, the cuchilla. The significant slowdown in deliveries from the exporters commenced in the second part of June, 1986. In early August, 1986 Echeverri sought vainly to obtain loan accommodations from Colombian bank sources. Ultimately on August 14 and 19, 1986 Ruben confessed that the coffee that purportedly backed up the truck bills of lading did not exist. The only time Andina realized that the Gonche Group was incapacitated to ship the coffee was when their fraud was confessed by Ruben as aforesaid.

31. Each of the truck bills of lading included in the Draw Documents presented under the letters of credit upon which losses were incurred by plaintiffs ("Fraudulent Document Losses") was fraudulent in that the coffee represented by the truck bills of lading did not exist when such documents were presented to and accepted by the Banks in New York and when the corresponding letters of credit were paid, and the said truck bills of lading were the proximate efficient and dominant cause of all of the Banks' losses.

32. There is no evidence that any ocean shipment ever commenced as to any of the coffee associated with the Fraudulent Document Losses.

33. As a result of their acceptance of the fraudulent truck bills of lading presented to draw under the relevant letters of credit, the Banks suffered Fraudulent Document Losses in the principal amount of $94,598,368.

34. Upon discovery of the fraud, each plaintiff gave timely written notice of loss to Affiliated. These notices of loss were submitted to Affiliated between August 21, 1986 and September 5, 1986.

35. Each plaintiff timely filed a written proof of loss with Affiliated between October 3, 1986 and October 23, 1986.[78]

36. Commencing on September 2, 1986, the Banks provided Affiliated with additional information and documentation supporting their losses, requested forms from Affiliated, proposed that a surveyor be appointed, and offered to make their employees available for interviews by Affiliated.

37. Affiliated did not accept any of the Banks' offers to interview any of their employees, and ignored the Banks' requests and proposals set forth in the preceding paragraph.

38. Neither Andina nor any of the Banks concealed from Affiliated any material facts concerning their losses.

39. The Banks and Andina in good faith fulfilled all obligations to Affiliated required to be performed in connection with their claims.

---

78. Chemical Bank and Andina filed their amended proofs of loss on March 3, 1989 and November 4, 1986, respectively.

40. There is no credible evidence whatsoever that the Banks were privy to the fraud.

41. Each of the Endorsements on Affiliated's Policies provided that "[t]his agreement shall not extend the said policy to cover any additional risks, it being especially agreed that the policy does not insure against conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assureds."

42. There is no credible evidence that Andina or its officers Canal or Kessler were privy to any fraud or dishonest act committed by or on behalf of the named assureds. The defendant failed to prove by a fair preponderance of the credible evidence that any dishonest acts were committed by or on behalf of the named assureds or by Kessler in the transactions of the Banks and of Andina in respect of the letters of credit and the false truck bills of lading created, issued or utilized by, or on behalf of Ruben Echeverri or Gonchecol.

43. The Banks' losses have not been paid by Affiliated.

44. Andina's losses have not been paid by Affiliated and Andina has assigned the proceeds of its claims under the Affiliated Policy to the Banks.

45. The Banks' claims against Affiliated for the Fraudulent Document Losses arising under letters of credit drawn and paid prior to March 21, 1986 are as follows:

**Unpaid Fraudulent Document Losses prior to March 21,1986**

| Bank | Amount |
| --- | --- |
| Chemical Bank | $14,860,000 |
| Banque Paribas | 14,392,500 |
| American Express Bank | 7,049,500 |
| NatWest Bank | 5,762,000 |
| Rabobank Nederland | 1,620,000 |
| European American Bank | 490,000 |
| **TOTAL:** | **$44,174.000** |

46. Pre-judgment interest on the principal amount of $44,174,000 unpaid to the Banks continues to accrue at a per annum rate of 9% or at a per diem rate of $10,892 from January 1, 1987.

47. Andina's claims against Affiliated for Fraudulent Document Losses arising under letters of credit paid before February 25, 1986, which are not duplicative of losses claimed by the Banks, are in the principal amount of $2,975,000. Pre-judgment interest on the principal amount of $2,975,000 continues to accrue at a per diem rate of $733 from January 1, 1987. Andina has assigned its claims in this litigation to the Banks to satisfy the loans it incurred from the drawn upon letters of credit.

48. In addition to the Fraudulent Document Losses the Banks claim against Affiliated, the Banks incurred Fraudulent Document Losses on and after March 21, 1986 in the principal amount of $50,424,368 (before interest).

49. Each of the plaintiffs asserted claims for Fraudulent Document Losses incurred on and after March 21, 1986 against the London insurers and the insurance brokers Hogg Robinson and Gardner Mountain Limited and Hogg Robinson (Cargo) Limited (together, "Hogg Robinson") and Trinder & Norwood ("T & N"), which purported to have placed "Ocean Open Cargo Policy No. TN–OCP–1811" (the "London Policy").

50. The London Insurers denied the plaintiffs' claims based upon, among other things, the defense that the London Policy was not properly bound and was void ab initio as a result of alleged placing errors and non-disclosures by Hogg Robinson and T & N. T & N and Hogg Robinson did not disclose to the London Insurers the fact that Affiliated had issued notices of cancellation of the Affiliated Policy dated November 27, 1985 and February 20, 1986 or the contents thereof. No Bank was advised of such purported cancellations and no Bank knew that the London Insurers had or would assert these defenses until after August, 1986.

51. In January, 1993, plaintiffs settled their claims against the London Insurers, Hogg Robinson and T & N for $25,217,375 (the "London Settlement").

52. Prior to the London Settlement, the Banks recovered $26,485,533 (before expenses shared by the Banks) from the liquidation of property voluntarily delivered to the Banks by Andina. This amount properly

excludes $2,288,366 in expenses incurred by Andina during liquidation.

53. In January, 1995, Ruben Echeverri agreed to provide partial monetary restitution to the Banks. Pursuant to that agreement, the Banks have received $10,500,000 from Gonchecol, and Gonchecol has promised to pay $500,000 per year for nine years without interest (absent a default). On April 25, 1997, a payment of $11,250 was received by the Banks from Gonchecol as payment of interest in consideration of the deferral to April 30, 1997 of the $500,000 payment due on January 31, 1997, which has not been received. On May 27, 1997, an additional payment of $11,250 was received by the Banks from Gonchecol in connection with a request to defer the $500,000 payment due on April 30, 1997 to July 31, 1997.

54. The Banks' loan agreements with Andina, which preceded the discovery of the fraud, authorized the Banks to apply all recoveries in any manner they selected. The relevant provisions of those agreements were reconfirmed by the Banks and Andina after the discovery of the fraud.

55. In addition, Andina under its existing by-laws and corporate structure, directed each Bank to apply all recoveries to payment in full of Andina's reimbursement obligations with respect to the letters of credit upon which Fraudulent Document Losses were incurred in the inverse chronological order of draw date. This was a permissible voluntary agreement and not made under duress.

56. From August, 1986, each of the Banks was entitled to charge interest on Andina's obligations at or above the prime rate.

57. The Banks have agreed to share recoveries and related expenses with respect to the Fraudulent Document Losses. Chemical Bank acts as Collateral Agent for the Banks in connection with shared recoveries and related expenses.

58. After application of the recoveries to the principal amount of the Fraudulent Document Losses incurred by the Banks on and after March 21, 1986 (and to interest accrued thereon either at the prime rate or at the legal rate of 9% per annum, but before ex-

penses), such losses have not been fully recovered, and no balance remains for application to the Banks' claims against Affiliated.

59. No part of plaintiffs' recoveries are available for application to their claims against Affiliated.

60. From and after 1980, T & N was engaged by Andina to obtain and service insurance concerning certain aspects of Andina's business. T & N acted as Andina's broker, for certain limited purposes, in connection with the Affiliated Policy.

61. On February 25, 1986, T & N purportedly advised Andina that coverage had been placed with the London Insurers under the London Policy "effective with all shipments made on/or after February 25, 1986."

62. T & N expected Affiliated to send notices of cancellation to the Banks.

63. Affiliated sent notices of cancellation of the Affiliated Policy to three of the Banks on March 11, 1986 and claims that it sent notice of cancellation to the other three Banks on that date.

64. Affiliated enclosed with the March 11, 1986 notice of cancellation Endorsement No. 38 to the Affiliated Policy which had a signature line for the "Assured." Such endorsement was never signed by Andina or the Banks.

65. T & N never communicated with any Bank regarding the purported cancellation of the Affiliated Policy; no Bank advised T & N at any time that T & N was authorized to commit a Bank regarding cancellation of or replacement of the Affiliated Policy; no Bank ever advised T & N that it was authorized to waive the cancellation provision.

66. There is no evidence that T & N purported to cancel the Affiliated Policy on behalf of any Bank.

67. There is no evidence that any Bank engaged in any conduct that would have led Affiliated to conclude that T & N was authorized to act for such Bank independently without express authorization regarding cancellation or replacement of the Affiliated Policy.

68. A modification or elimination of the Banks' rights to 10 days' prior written notice of cancellation is, in itself, a material change that would require 10 days' prior written notice. No such notice was ever given, nor was any such modification or elimination effected.

69. The Banks did not agree to waive or release any liability of Affiliated under the Affiliated Policy, and T & N had no authority to waive any rights of the Banks under the Policy.

70. The Affiliated Policy was not canceled as to the interest of any Bank prior to March 21, 1986.

71. The London Policy (Finding # 49) became effective as to all ocean shipments on and after February 25, 1986. Defendant contended herein that the London Policy also, by an Endorsement No. 9, covered the Colombian interior risk for shipments where an ocean bill of lading had issued on or after February 25, 1986.

72. Endorsement No. 9, dated April 22, 1986 ("Endorsement No. 9"), is an endorsement to the London Policy. It is not an endorsement to the Affiliated Policy.

73. At the time Endorsement No. 9 was issued, all of the Fraudulent Document Losses claimed against Affiliated had already occurred.

74. The last endorsement to the Affiliated Policy is Endorsement 38, which bears the typewritten date February 25, 1986. After issuance of Endorsement 38, there was no advice from Affiliated of any further changes to the Affiliated Policy.

75. No evidence was presented that written notice was given to the Banks of any purported changes to the Affiliated Policy resulting from the issuance of Endorsement No. 9.

76. No Bank received a copy of the London Policy prior to May 14, 1986.

77. When the London Policy was sent to the Banks on May 14, 1986, it did not contain a copy of Endorsement No. 9.

78. Even if Endorsement No. 9 covered interior risks without ocean shipment, the London Policy is insurance on that interest subsequent in date to the Affiliated Policy. In addition, Endorsement No. 9 only covers shipments of actual coffee that had commenced interior transit before February 25, 1986.

79. Endorsement No. 9 to the London Policy did not alter or affect the Banks' coverage under the Affiliated Policy.

80. All of the truck bills of lading presented to and accepted by the Banks which resulted in the Fraudulent Document Losses are fraudulent because the coffee represented thereby did not exist and thus was not in the possession of or taken in charge by the trucker at the time that such truck bills of lading were presented as Draw Documents and accepted by the Banks.

81. The truck bills of lading presented to the Banks under the letters of credit issued by the Banks evidenced that the trucker had assumed responsibility for the coffee.

82. There is no evidence that the date on the truck bills of lading represented the actual issuance date of those documents. The date appearing on the truck bills of lading represented the issuance date only for purposes of "staleness" under the UCP 400 and was not necessarily the actual issuance date.

83. The letters to the Banks from Colombian banks transmitting the Draw Documents were not Draw Documents under the letters of credit.

84. The letter of credit document examiners at each Bank were required to check only the Draw Documents for their compliance with the letters of credit.

85. The dates on the truck bills of lading or the letters transmitting the same did not put any Bank on notice of any misconduct.

86. The letters of credit at issue in the litigations conducted in the Supreme Court, State of New York, entitled *Andina Coffee, Inc. v. Cooperative Centrale Raffeisenboerenleenbank* B.A., et at., Index No. 20123/86, and *Andina Coffee Inc. v. National Westminster Bank U.S.A.*, et al., Index No. 19759/86, were materially different from those on which the Banks make claim here. Additionally, the portions of the State Court submissions relied upon by Affiliated are in-

correct or inapplicable to the facts presented here.

87. Prior to mid-August 1986, neither Andina nor any of the Banks had any sufficient reason to suspect that the coffee financed by draws under the letters of credit did not exist.

88. Prior to the discovery of the fraud in mid-August 1986, neither Andina nor any of the Banks knew that Ruben Echeverri or his family had an ownership interest in and controlled Empresa Nacional De Transportes Ltda., d/b/a Enaltra ("Enaltra"), the Colombian trucker used by Ruben Echeverri to utilize the fraudulent truck bills of lading at issue.

89. Ruben Echeverri's accusation that Andina's management knowingly financed nonexistent coffee is repudiated by Gonchecol's coffee position reports and Andina's Harris computer reports (which were derived therefrom) in that: (a) the position reports did not uniformly report the coffee at all of the mills (coffee was reported at anywhere from 6 to 19 mills); (b) at least 130 lots of Gonchecol's coffee, worth approximately $13,-000,000, that did not appear on any position report were, in fact, shipped from Colombia; (c) over $38,000,000 of Goncheverri's and Gonchelopez' coffee financed by Andina between October 1, 1985 and June 19, 1986 is not reported on any position report, and Goncheverri and Gonchelopez have never been accused of fraud; and (d) Ruben Echeverri had nothing to do with the preparation of the reports.

90. Ruben Echeverri's accusation that Dennis Kessler improperly interfered with Arthur Andersen's September 30, 1985 audit of Andina's financial statements by inducing or attempting to induce Arthur Andersen to certify to an overstatement of inventory is not credible. There is no evidence that Arthur Andersen used anything other than appropriate auditing standards in connection with the inventory audit at the statement date.

91. Andina's bank statement for May, 1986 does not show that funds drawn by Gonchecol under letters of credit were deposited directly to Andina's account to repay prior outstanding letters of credit. Ruben Echeverri acknowledged that Gonchecol had access to dollars with which to pay its obligations to Andina, notwithstanding any Colombian currency control laws.

92. From time to time and in the ordinary course of its business, Andina prepaid its reimbursement obligations arising from draws under letters of credit in order to, among other things, reduce borrowing costs. These prepayments were not evidence of fraud.

93. Once the reimbursement obligation relating to a letter of credit was paid, the Banks had no reason to and did not receive further information or documentation concerning the transaction giving rise to that obligation.

94. Periodically, port congestion, strikes, and quota restrictions delayed shipment of coffee and repayment of sums advanced to purchase such coffee under the letters of credit. As a result, requests were made by Andina from time to time to the exporters for funds to liquidate letters of credit prior to the sale of the coffee being financed, and the exporters complied with these requests. Andina believed that the exporters had ample means to provide such funds.

95. Although Affiliated had knowledge of the coffee exportation process, the Colombian exporters, and the nature of the letter of credit financing provided by the Banks to Andina, it did not specify or restrict the documents to be used as Draw Documents under the letters of credit issued by the Banks.

96. The Affiliated Policy does not require as a condition to coverage:

(i) that the Banks monitor or track any portion of the transaction, including the length of time from the issuance of a truck bill of lading to the issuance of an ocean bill of lading;

(ii) that the Draw Documents to be issued in connection with letter of credit financing be title documents;

(iii) that the Draw Documents to be issued in connection with letter of credit financing

be negotiable title documents under Colombia law;

(iv) that the Banks limit the financing provided, including a limitation of the interior portion of the financing;

(v) that the Banks have perfected security interests in insured goods; or

(vi) the use of a "Revision," "Guia," "Orden de Cargue," or "Registro de Contracto" as Draw Documents.

97. Paragraph 38 of the Affiliated Policy provided that Andina would declare shipments to T & N for transmission to Affiliated.

98. The declarations by Andina to T & N were made on a weekly basis when Harry Pedersen, a T & N employee, visited Andina and took letter of credit draw reports, ocean bills of lading and other documents related to declarations and claims.

99. Various employees of T & N would review, notate and compile the Andina documents for transmission to Affiliated. T & N also prepared bordereaux of interior movement, ocean movement, and warehoused coffee.

100. In order to determine the rate to be applied, T & N waited for the ocean bill of lading for each shipment and determined the ocean shipping terms at that time. If the coffee was sold FOB Colombia, Andina was not responsible for insurance of the ocean voyage and an interior movement report and declaration was transmitted by T & N to Affiliated. If coffee was sold under terms making Andina responsible for the insurance of the ocean voyage, an ocean bordereaux and declaration was transmitted by T & N to Affiliated.

101. On occasion, T & N waited as much as a year after the time it was given an initial letter of credit draw report to compile all information concerning a specific shipment and include that information in a bordereaux report. Such delays were the result of the quarterly reporting system for the Affiliated Policy and the need to await information to establish the rate to be applied and as to the valuation of the cargo.

102. This system was followed by T & N. Affiliated accepted declarations under this system, without complaint from at least 1980 through 1986.

103. There was no intentional delay by Andina in making declarations of shipments under the Affiliated Policy.

104. There is no evidence that Affiliated gave written notice to Andina or any Bank of cancellation for reasons of incomplete declarations or nonpayment of premium.

105. The Banks were not required to make declarations or to pay premiums under the Affiliated Policy.

106. Any alleged failure to pay premiums or make declarations by Andina does not affect the Banks' coverage under the Affiliated Policy.

107. Clause 9 (Limit of Insurance) of the Affiliated Policy provides that "[t]his insurance shall cover for not more than $8,000,000 ... in any one place at any one time." Each presentation and acceptance of fraudulent bills of lading took place at separate Banks at separate times. Each presentation and acceptance was for less than $8,000,000. Clause 9 does not limit the plaintiffs' claims against Affiliated.

108. Clause 10 (Accumulation) of the Affiliated Policy provides:

"Should there be an accumulation of interests beyond the limits expressed in this policy by reason of any interruption of transit beyond the control of the Assured, or by reason of any casualty or at any transhipping point or on a connecting vessel or conveyance, this policy shall attach for the full amount at risk (but in no event for more than twice the policy limit) provided written notice be given (to this Company) as soon as known to the Assured."

109. This accumulation of interests clause is inapplicable to the plaintiffs' claims because (i) no transit had taken place (the relevant truck bills of lading were false and fraudulent in that the coffee described therein did not exist and was never in the possession or under the control of the trucker), and (ii) there was no casualty in transit at any transhipping point or on any vessel or conveyance. Even if Clause 10 were applicable

to the losses at issue in this case, it would apply separately to each assured. Thus, Clause 10 is irrelevant because no Bank's principal claim exceeds $16,000,000, and Andina's claims against Affiliated which are not duplicative of losses claimed by the Banks do not exceed $16,000,000.

110. Endorsement No. 3 (Warehouse Endorsement) extends the Affiliated Policy to "cover the goods insured" for the import voyage under this open policy while temporarily situated at the locations listed herein [U.S. warehouse locations], and Endorsement No. 4 (Colombian Locations) extends this coverage to "coffee awaiting export while stored at the following locations in Colombia." The Limit of Liability under Endorsement No. 4 that "this Company shall be liable for no more than $3,000,000 any one location, nor for more than $10,000,000 over all locations at any one time" is inapplicable. None of the plaintiffs' claims here are due to losses that occurred at warehouse locations.

111. The losses of the plaintiffs sued for herein were not caused by dishonest acts of the assured. No dishonest acts of the named assured, Andina, were the proximate cause of the losses sued on.

112. Andina and its principal officer, Kessler, were not guilty of any conversion, misappropriation or other dishonesty in respect of the false documents utilized to cash the Banks' letters of credit.

113. Decision of these cases turns uniquely on the issue of credibility of the key players and, in a subsidiary way, of the representatives of the parties and their motivations. The issues of credibility herein are resolved in favor of the plaintiffs and against the defendant.

## CONCLUSIONS OF LAW

A. The Federal District Court has subject matter jurisdiction over the issues in controversy in this action pursuant to diversity of citizenship and requisite amount in controversy.

B. The venue of the Southern District of New York is proper.

■ C. This Court having found that all of the Draw Documents submitted to the Banks with respect to the Fraudulent Document Losses were accepted by the Banks in New York and that no ocean shipment ever commenced as to such losses, admiralty jurisdiction does not exist in this case.

D. New York law is the controlling substantive law.

■ E. The plaintiffs base their claims on the undisputed fact that truck bills of lading presented to draw upon letters of credit were false in that the stated cargo did not exist at the time the truck bills of lading were presented. The FBOL Clause of plaintiffs' policy covers these losses.

F. Affiliated's contention that the Affiliated Policy required existing cargo is contrary to the plain, unambiguous language of the FBOL clause.

G. While this Court finds no relevant ambiguity in the Affiliated Policy, were there any such ambiguity, it would be construed against the insurer.

H. Coverage exists for the Banks under the Affiliated Policy as additional assureds under both the "for account of whom it may concern" clause and the Bankers' Endorsements issued to each Bank.

■ I. This Court having found that no plaintiff had actual knowledge of the fraud, Affiliated's contention that each plaintiff should have known of the fraud being perpetrated has no legal merit. As a matter of law, insurance coverage is avoided where an insured intends to cause its loss, but not where its negligence (ordinary or gross) causes the loss. Thus, it is not sufficient for Affiliated to prove that a plaintiff "should have known" of the exporter's fraud; to avoid liability it must prove that the plaintiff actually knew of the falsity of the truck bills of lading and nonexistence of the coffee at the time the relevant letters of credit were drawn upon and paid.

■ J. Affiliated's contentions that bills of lading should have been "title" documents, or that Colombian export documents such as a "Revision," "Guia," "Orden de Cargue," "Registro de Contracto" would have avoided

the possibility that a beneficiary would draw with knowingly false truck bills of lading (nonexistent coffee) are defeated by the provisions of the Affiliated Policy, which do not require these documents for coverage under the FBOL Clause or otherwise.

■] K. Affiliated's contention that plaintiffs must prove actual reliance upon the draw documents is without merit because the FBOL Clause requires only that the losses be caused (*i.e.,* "occasioned") by the acceptance of fraudulent truck bills of lading, not that such documents be relied upon. Even though reliance upon the truck bills of lading was not required as a matter of law, the acceptance of the truck bill of lading and its use by each Bank to confirm the existence of the coffee and the commencement of the export cycle demonstrates reliance by each Bank on the fraudulent truck bills of lading.

■] L. This Court having found no credible evidence that Andina knew of or participated in the fraud or of the creation and use of false documents by Ruben Echeverri and the Gonche Group, no conduct of Andina is a defense to any claim asserted by plaintiffs. Where an insurer asserts an affirmative defense based on the "conversion, misappropriation or other dishonest acts committed by or on behalf of the named Assured," it must prove the defense by a preponderance of the evidence; here Affiliated did not establish this affirmative defense by a preponderance of the credible evidence presented to the Court thereon.

M. This Court having found that no Bank knew of or was privy to or participated in fraud, each Bank is an innocent co-assured entitled to coverage under the Affiliated Policy.

■ N. Each of the plaintiffs timely complied with the notification and documentation requirements under the Affiliated Policy with respect to its claim of loss. Further, under New York law, clauses in insurance policies requiring "immediate notice" to the insurer are construed to require notice within a reasonable time after a duty to give notice has arisen.

■] O. Notice and proof requirements are liberally construed in favor of the assured and merely require substantial, not strict, compliance.

■] P. This Court having found that each plaintiff acted in good faith in connection with these claims, the doctrine of *uberrimae fidei,* pursuant to which parties to a marine insurance contract owe each other the utmost degree of good faith, is not implicated. Moreover, it does not apply here because the claims made arose under inland risks, not marine risks.

Q. This Court having found that there is no dispute that the Affiliated Policy was canceled as to the interests of Andina with respect to shipments on or after February 25, 1986, but that separate endorsements to the Policy expressly provided that each Bank is entitled to 10 days' prior notice of cancellation and such notice was first given to some Banks on March 11, 1986, the earliest cancellation date of the Affiliated Policy as to the interest of any Bank was with respect to shipments on or after March 21, 1986.

R. T & N had no express, implied, or apparent authority to cancel the Bank's insurance coverage or to waive the right of any Bank to notice of cancellation stipulated in the insurance policy.

■ S. As a matter of law, replacement of an insurance policy does not automatically result in cancellation of that policy, and cancellation provisions of the earlier policy must be followed. Moreover, the Affiliated Policy explicitly provides in clause 15 thereof, that it remains in force if a subsequent policy attached to the same interest.

■ T. The doctrine of ratification involves a party's subsequent authorization of an unauthorized act undertaken on behalf of the party. Here, in view of the absence of any evidence that T & N purported to act on behalf of any Bank with respect to cancellation or replacement of the Affiliated Policy, there was no unauthorized act which could be the subject of a subsequent ratification by any Bank.

■ U. Since no Bank knew of the losses that had occurred prior to August

1986, and no Bank knew that London Insurers had a defense based on non-disclosure which permitted the London Policy to be avoided *ab initio,* no Bank effectively ratified the alleged agreement between T & N and Affiliated to cancel the Affiliated Policy as of February 25, 1986. An invalid or defective cancellation will not become effective by ratification where the insured does not have full knowledge of its rights and all material facts, including that losses had occurred or that a purported "substitute" insurer (here London Insurers) would later deny attachment of its policy.

■ V. Endorsement No. 9 to the London Policy did not alter the Affiliated Policy, nor did it affect any of Affiliated's obligations to the plaintiffs under the Affiliated Policy. Moreover, a party to a contract cannot relieve itself of obligations under a contract without the express consent of the other party to that contract. Thus, because the plaintiffs were unaware of Endorsement No. 9 until after the discovery of the fraud in August 1986, any agreement among Affiliated and the London Insurers relating to Endorsement No. 9 does not affect Affiliated's obligations to the plaintiffs under the Affiliated Policy.

■ W. As to each of the Banks, the Affiliated Policy covered shipments or purported shipments occurring on or before March 21, 1986. As to Andina, the Affiliated Policy covered shipments or purported shipments occurring before February 25, 1986. Each of the losses claimed in this matter relates to purported shipments on or before March 21, 1986 for the Banks and before February 25, 1986 for Andina. Consequently, each loss is covered by the Affiliated Policy.

■ X. This Court having found that the plaintiffs paid money at the time of acceptance of the fraudulent documents the time of each insured loss is the time that such money was paid. Where a party is induced to pay money on the basis of fraudulent documents, a loss occurs at the time the money is paid out, not when the party discovers the fraud.

■ Y. Loss occurs under a transportation or cargo policy when an insured peril causes harm to the interest insured, and not when the loss is discovered or manifest.

Z. Affiliated's contentions concerning the Banks' compliance with the law or practices governing documentary letters of credit is not relevant in determining whether there is a covered loss under the Affiliated Policy. Even if the Banks had a duty to Affiliated to comply with the law or practices governing documentary letters of credit, the Banks did comply.

AA. The plaintiffs are entitled to pre-judgment interest at the rate of 9% per annum from January 1, 1987 to the date of entry of judgment hereon. Pre-judgment interest at the statutory rate of 9% per annum from January 1, 1987 to the date of entry of judgment is mandatory. Even if this Court had discretion concerning interest, such as under the law of New Jersey, the Second Circuit has held in a similar case that interest be awarded.

■ BB. This Court having found that plaintiffs' losses occurring on and after March 21, 1986 have not been fully recovered from other sources, the plaintiffs are permitted to allocate all third-party recoveries to losses after March 21, 1986. As a matter of law, an insured must be made whole before an insurer is entitled to receive credit for any portion of the insured's recoveries.

■ CC. This Court having found that before (and after) the discovery of the fraud, each of the Banks entered into a contractual agreement with Andina which provided that each of the Banks had the right to apply recoveries in any manner they selected, the allocations of recoveries made by the Banks are permitted by law. Quite apart from the contractual agreements that authorized each Bank to apply recoveries in any manner it selected, the law provides that a debtor owing a creditor more than one debt has the right to direct how a payment shall be applied. Where the debtor fails to make such direction, the creditor may apply the payment as it deems fit.

■ DD. A debtor and creditor are free to agree to a particular allocation at the time

of payment or later, and free to reallocate payments after a particular allocation has been made.

■■] EE. The right of the debtor and creditor to make a particular allocation or reallocation is not affected by third parties, who generally have no standing to protest.

■■] FF. Under New York law, the right of the debtor and creditor to specify an allocation does not cease when litigation is commenced; rather, an allocation may be made at any time until a court has ordered one.

■■] GG. Quite apart from the rule of law that an insured must be made whole before an insurer may share in subrogation, and even if the agreements of the parties on allocation were not controlling, the plaintiffs are still at liberty to allocate their recoveries to the period of the London Policy, because the London Insurers have settled and been released. As between the London Insurers (who may no longer be pursued as an avenue of recovery and) who had a defense that their policy was void *ab initio,* on the one hand, and Affiliated, which makes no such assertion as to its policy on the other hand, the London Policy is least secure.

HH. Affiliated seeks to take advantage of certain Banks' internal bookkeeping entries which caused a portion of Andina's obligations, or interest accruing thereon, to be removed as an asset from the Banks' books. The practice of writing off or writing down a debt has no bearing, however, on a bank's right to collect those amounts. Moreover, the contractual agreements of the parties not only permitted, but required, the application of recoveries to interest.

II. The Banks properly applied certain recoveries to interest, with the surplus, if any, to the principal on a *pro tanto* basis.

JJ. Ruben Echeverri's dishonesty in defrauding the Banks cannot be imputed to Andina so as to bar recovery under the Affiliated Policy.

KK. The Banks have proved that from January 13, 1986 through March 21, 1986, the latter being the earliest date the defendant's policy could have been cancelled under the terms thereof, as to the Banks, they

advanced and paid a total of $44,174,000 to Gonchecol against fraudulent truck bills of lading covering coffee that did not exist, which were presented to the Banks for payment under letters of credit which the Banks had issued. None of the plaintiffs actually knew of the nonexistence of the coffee when the relevant letters of credit were drawn upon and paid.

■■■■. The Bankers' Endorsements' "non-impairment" and "no dishonest acts" clauses do not contradict one another: 1) the "non-impairment" clause expressly addresses the interest of each Bank and provides that each of the Bank's interest shall not be impaired or invalidated by any act or neglect or breach of warranty or condition by Andina; and 2) the "no dishonest acts" clause refers to Andina's rights under the policy in light of the Bankers' Endorsements, and makes it clear that the Endorsement does not extend Andina's coverage under the policy to cover additional risks. However, even if the "non-impairment" and "no dishonest acts" clauses were in conflict with each other, the conflict would be resolved against Affiliated, the drafter of the policy, and the former clause (i.e., the "non-impairment" clause) would supersede the latter (i.e., the "no dishonest acts" clause).

MM. The plaintiffs herein are entitled to recover judgment in their favor and against the defendant with pre-judgment interest as aforesaid to be added by the Clerk to the following principal awards:

| Plaintiff | Amount |
| --- | --- |
| Chemical Bank | $14,860,000 |
| Banque Paribas | 14,392,500 |
| American Express Bank Ltd | 7,049,500 |
| NatWest Bank N.A. | 5,762,000 |
| Rabobank Nederland | 1,620,000 |
| European American Bank | 490,000 |
| Andina Coffee, Inc. | 2,975,000 |

Counsel should submit a proposed calculation to the Clerk of the Interest allowed.

The foregoing Opinion and Findings together with the Additional Specific Findings and Conclusions shall constitute the Findings

of Fact and Conclusions of Law required by Fed.R.Civ.P. 52(a).

SO ORDERED.