AMERICAN ANCHOR & CHAIN COR-
PORATION, Chester, Pennsylvania

v.

The UNITED STATES.

No. 297–60.

United States Court of Claims.
May 15, 1964.

---

* 1964 Rules, rule 47(c).

Edward Gallagher, Washington, D. C., for plaintiff.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

Plaintiff is a small Pennsylvania company, organized in June 1955 to manufacture non-magnetic anchors, chains, tools, fittings, and foundry items. Its sole plant and its mailing address were at Fieldsboro, New Jersey, but the executive officers were stationed some sixty miles away in Chester, Pennsylvania, where an affiliated company was located. During 1956 the employee in charge at Fieldsboro was H. L. Landauer, the Works Manager.[1] He was not authorized to sign, at his own will, contracts with the Federal Government, but he could do so after receiving the prior approval of Mr. Linnenbank, a vice-president (in Chester). The source of the present controversy is that in September 1956 Landauer entered into two Government contracts, on behalf of plaintiff, which plaintiff now disavows as unauthorized. After unexcused delays in shipment, the defendant terminated these two agreements for default, purchased the items from another supplier, and deducted the excess it had to pay ($9,893.32) from amounts due plaintiff under other contracts. Plaintiff sues to recover that sum on the ground that the defaulted agreements were not its responsibility, but were the products of an unauthorized frolic of Landauer's which the company never confirmed. That is the sole challenge to the defendant's actions in reletting the contracts.

There is a direct clash between Landauer and Linnenbank as to whether the latter orally approved the former's signing of these two specific contracts, and on this record we do not find that such prior approval was actually given. Decision turns, rather, on the issues of apparent authority and ratification. If Landauer was apparently endowed with authority to consummate federal contracts, or if the company later ratified his actions, the defendant cannot be held for terminating the agreements and charging the excess costs to plaintiff.

■ A. It is now commonplace that, except where formality is expressly required, apparent authority to do an act on behalf of a principal may be created by written or spoken words or other conduct of the principal which, if reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. A.L.I., Restatement, Agency 2d, § 27 (1958); Standard Oil Co. v. Lyons, 130 F.2d 965, 968 (C.A.8, 1942). The heart of this principle is that it is fair—especially in a complex society where transactions are most often carried on through others— to require "one who allows another to appear to be his agent * * * [to]

---

1. On December 19, 1956, Landauer wrote a letter of resignation, effective "on January 15, 1957, or sooner, whichever suits your convenience."

bear any loss resulting to a third party from his dealings with the apparent agent in that capacity in reliance on his supposed authority." Mechem, Outlines of the Law of Agency (4th ed., 1952), § 84. The free flow of commerce, large and small, would be shackled if the burden of ascertaining the agent's real authority were put upon the multitudes of individuals dealing, every day, with agents whose principals seem to have clothed them with adequate authority to do business. Although the Federal Government still stands on the stricter requirements of actual authority for its own agents (see, e. g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)), the agents of Government contractors are governed by the usual rules.

One familiar type of agency by apparent authority is appointment "to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." A.L.I., Restatement, Agency 2d, § 27, Comment a (1958). "It makes no difference that the agent may be disregarding his principal's directions, secret or otherwise, so long as he continues in that larger field measured by the general scope of the business entrusted to his care." Kidd v. Thomas A. Edison, Inc., 239 F. 405, 407 (S.D.N.Y.), aff'd, 242 F. 923 (C.A.2, 1917). See, also Mechem, op. cit. supra, § 93; Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823, 834 (C.A.6, 1941); Arkansas Valley Feed Mills, Inc. v. Fox De Luxe Foods, Inc., 171 F.Supp. 145 (W.D.Ark.1959), aff'd, 273 F.2d 804 (C.A.8, 1960).

■ Except possibly for one factor, the present case fully meets this classic measure of apparent authority. Plain-

tiff had but one plant, at Fieldsboro, and its letterhead gave Fieldsboro as its only address. The telephone number given in its bids and applications was that of the plant. Landauer, called the "Works Manager," was the man in charge of the management and operation of that single plant; no one stationed there was above him in authority and no notice was given the defendant of any limitations on his authority. He appeared to be a top management official, though not an officer. He was admittedly authorized to make certain small purchases and minor sales, as well as to sign checks for the payroll and for the purchases he made—so that on the surface he would appear to third parties, unaware of the limitations on his authority, as having the usual buying, selling, and employing functions of a top manager. Landauer consistently held himself out, orally and in writing, as fully competent to deal with Government representatives.[2] He alone dealt on a managerial level with the inspector who came to make the pre-award survey on one of the contracts in suit; the inspector had no contact (and was not asked to make contact) with any of plaintiff's officers. Whatever phone conversations were had before the awards were with Landauer. He signed all the applications, bids, and correspondence, on behalf of the plaintiff. Four bids on Government work were made by plaintiff in 1956 to the same naval office in Philadelphia (the two in suit and two others); each was signed by Landauer, alone, as "Works Manager." Plaintiff admits that the bids on the two awards not now involved, though signed only by Landauer, were authorized in advance by Linnenbank; those authorized bids (looking precisely like the bids in suit) were dated and received by the Navy well before September 1956 when it made the awards now challenged. Two negotiated contracts, likewise authorized in advance, were later made with that same Navy office, and each was similarly signed by

---

**2.** He took this stance because he believed that his actions were all approved or directed by the officers at Chester, but so far as the defendant was concerned he acted without indicating that his authority to deal was restricted.

Landauer alone.[3] Plaintiff thus allowed the Navy to believe that Landauer was its Works Manager, competent to sign Government contracts, and possessed of general contractual authority. The same appearance was maintained at all relevant times. Between February and December 1956, there were some fifteen contacts, written and oral, between the two interested Navy offices (in Philadelphia and Camden) and plaintiff in which Landauer was the sole person to act for the company; there were no contacts with any other representative of plaintiff. Whatever intermittent supervision there was from Chester was invisible to third parties without day-to-day connection with the company.[4]

The short of it is that plaintiff placed Landauer in a managerial position in which (i) outsiders would naturally be led to believe that he had authority to carry on the business of this small company's sole plant, including the making of contracts which would engage that plant's facilities, and (ii) Landauer himself was left free to act as if he were the company's full manager and authorized representative and, in doing so, to exceed his real authority without check or deterrent. Through carelessness or design, this principal pushed its agent to the very forefront of its sole operation and kept well hidden all the strings it had tied to him. It cannot complain if, like Pinocchio, he broke the strings and grasped the substance of the role it allowed him to appear to have. The defendant did not have the burden of ferreting out unrevealed restrictions that might have been placed on the agent. By its own affirmative conduct as well as its omissions, plaintiff made it entirely reasonable for the Government to believe that Landauer had authority to commit the company to the two Government contracts for which it now disclaims responsibility. That he was known not to be an officer of the corporation was immaterial; the important thing was that he was made (and allowed) to appear as the manager of the company's only operation, and, as such, in charge of that activity with capacity to contract. Cf. Grand Trunk Western R. Co. v. H. W. Nelson Co., supra, 116 F.2d 823, 833, 834 (C.A.6, 1941); Phillips Petroleum Co. v. Buster, 241 F.2d 178, 182–183 (C.A.10), cert. denied, 355 U.S. 816, 78 S.Ct. 18, 2 L.Ed.2d 33 (1957). Conversely, the Navy, which obviously thought that it was dealing with an authorized agent, acted reasonably in relying on the image plaintiff had established.

■ The one factor which gives pause is the requirement, in the defendant's invitations for bids, that "Bids signed by an agent must be accompanied by evidence of his authority." None of the four bids made by Landauer in plaintiff's name—two acknowledged to have been authorized and two disputed in this case—was accompanied by any specific

---

3. The two negotiated agreements contained formal certificates, executed by Linnenbank, that Landauer was the Works Manager and that the contract was duly signed for and on behalf of plaintiff by authority of its governing body and was within the scope of its corporate powers.

4. In one of the contracts involved in this case, there were serious errors in the bid submitted by Landauer on behalf of plaintiff. The pre-award inspector for the Navy thought that because of these oversights the company would suffer a loss on the contract, but his report indicates that plaintiff (through Landauer) "was willing to absorb any loss in order to establish themselves as a supplier of this type material." The inspector recommended that the bidder be required to reaffirm its bid price in writing and to post a performance bond. These recommendations were not followed (as they did not have to be), probably because Landauer had already written the Navy, a month earlier, that the company would supply the material (on which it had bid) "at price quoted." These exchanges on the errors in the bid were all through Landauer. The files of plaintiff's plant at Fieldsboro were, of course, open to the executive officers (from Chester) but they apparently did not canvass them very thoroughly even though Linnenbank visited Fieldsboro about once a week.

written evidence of his authority.[5] In the circumstances of the case, we think, however, that this absence of direct written evidence of authority was neither a fatal defect nor a warning to the Government to question Landauer's position. Assuming that this provision of the invitation was intended to apply to officers or employees signing on behalf of their own corporation (rather than merely to an outside agent acting for a contractor), we find substantial compliance. Although no written evidence was actually attached to the invitation, prior to the awards there were other evidences of Landauer's authority already on file within that particular naval office; in that sense the two bids which are now questioned were "accompanied by evidence of * * * [the agent's] authority" before the awards were made. In February 1956, plaintiff, in a letter signed by Landauer, had requested information from the naval office about Government sales. In June 1956, plaintiff (again through Landauer) had filed a Bidder's Mailing List Application which expressly gave Landauer as the person authorized to sign bids and contracts in the company's name.[6] A Supplement to this Application was also signed by the Works Manager. (Plaintiff now rejects these letters and applications, but as we have pointed out plaintiff alone made it possible for Landauer to send them.) Not long before the awards were made on the two bids in suit two other bids in exactly the same form—but conceded to be authorized—had been received by the same Government agency. The agency thus had in its possession four similar

bids signed by Landauer when it made the two awards now disputed.[7] In combination, these various papers designating Landauer as a proper employee to sign for plaintiff, taken together with the Government's other dealings with him, furnished sufficient evidence of his authority. The general requirement that the bid must "be accompanied by evidence of * * * [the agent's] authority"—unlike the formal certificate demanded for negotiated contracts (see footnotes 3 and 5)—was not intended to call forth any particular form, wording, or proof. Nor was the requirement designed to place on the defendant the risk that the agent might lack *real* authority. The purpose, rather, was to alert both the contractor and the Government to the subject of the agent's authority and to require, at the least, some solid proof sufficient to warrant the defendant's entering into a contractual relationship. Here, the showing available to the agency, at the time it made the awards, was more than enough to endow the agent with apparent authority to sign. That strong showing constituted adequate "evidence of his authority."

■ B. Alternatively, we hold that the plaintiff ratified Landauer's acts in entering into the contracts. Plaintiff's executive officers testified that they had no knowledge of the disputed agreements until early January 1957 when they learned from Landauer and the Navy of the contracts' existence. But it was not until May 17, 1957, after the default termination of both contracts,

5. The printed form for negotiated contracts contains a form of certificate which must be completed if the contractor is a corporation. This printed certificate was filled in and signed for the two negotiated contracts made by plaintiff. See footnote 3, supra. The forms for bid contracts do not contain any such certificate or any form for evidencing an agent's authority. This difference in the two forms is significant.

6. The form for the Bidder's Mailing List Application required that it "be presented and signed by the principal as distin-

guished from an agent, however constituted." This requirement was fulfilled because plaintiff was designated as the applicant. There was no additional requirement of evidence of a corporate signer's authority.

7. In addition, very shortly after the two awards involved in this case (September 7 and 14, 1956), the contractor signed (on September 20, 1956) the first negotiated contract containing a certificate from Linnenbank that Landauer, as Works Manager, was authorized to sign that contract. See footnotes 3 and 5, supra.

that plaintiff first took the position that its Works Manager had acted without authority. In the meantime the officers conferred (on January 10 and February 12, 1957) with Navy representatives on the company's contracts. (By the latter date, one of the contracts in suit had already been terminated.) The contracting officer's contemporaneous memorandum of the February 12th conference gives no intimation that plaintiff's officers repudiated the two disputed contracts; on the contrary, all the indications are that the officers, affirmatively conducting themselves as if they considered the contracts binding, sought some measure of administrative relief, such as cancellation without cost or liability. Thereafter the plaintiff apparently attempted to perform the one contract not yet terminated or to subcontract the work; in that connection, plaintiff's representatives even gave the Navy some informal indication of possible dates of shipment. However, in March 1957, plaintiff wrote, with respect to the unterminated contract, that it had "exhausted every effort to subcontract [the] parts involved" and asked for a no-cost cancellation. The Navy's response was to end that contract, too, for default. About two months later, after the Navy had charged the company with $9,893.32 in excess costs, plaintiff first suggested that the contracts were not valid.

"An affirmance of an authorized transaction can be inferred from a failure to repudiate it." A.L.I., Restatement, Agency 2d, § 94 (1958). "If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time, is, unless explained, sufficient evidence of affirmance." Ibid., Comment c. See also Comments a and b, as well as the Reporter's notes, Appendix, pp. 166–76, 180.

Measured by these principles, plaintiff's conduct, after it was made aware of the contracts, amounted to ratifica-tion. Though it would have been normal to repudiate the agreements at once, and no reason is suggested for postponing that decision, plaintiff did not even hint at this course for several months. Instead, it conferred with the defendant on the basis that the agreements were valid and sought an acceptable way out of its difficulties. With respect to one contract it even made some further efforts toward performance, either through its own facilities or by a subcontract. The Government evidently gave plaintiff some time to see what it could do, and to that extent delayed taking final steps to wind up the transactions. The re-letting of the work by the defendant occurred before the attempted repudiation. Though it is unnecessary to show action in reliance on the ratification, we think that the defendant did adapt its actions to plaintiff's desire for further time in which to attempt to salvage the contracts. In any case, plaintiff's course of conduct implies that it ratified the agreements well before it tried to repudiate them.

The plaintiff is not entitled to recover and the petition is dismissed.