**CHEMICAL BANK, European American Bank, Banque Paribas, American Express Bank Ltd., NatWest Bank National Association, and Rabobank Nederland, Plaintiffs–Appellees,**

v.

**AFFILIATED FM INSURANCE CO., Defendant–Appellant,**

**Andina Coffee, Inc. and Andina Trading Corp., Consolidated Plaintiffs–Appellees,**

Lloyd's Syndicate No. 446, Lloyd's Syndicate No. 418, Lloyd's Syndicate No. 406, Lloyd's Syndicate No. 40, Lloyd's Syndicate No. 367, Lloyd's Syndicate No. 34, Lloyd's Syndicate No. 334, Lloyd's Syndicate No. 321, Lloyd's Syndicate No. 309, Lloyd's Syndicate No. 304, Lloyd's Syndicate No. 162, Lloyd's Syndicate No. 123, Lloyd's Syndicate No. 108, Lloyd's Syndicate No. 1014, Lloyd's Syndicate No. 52, **Insurance Company of North America, Home Insurance Company, Phoenix Assurances Public Limited Company, Cornhill Insurance PLC., Commercial Assurance Co. PLC, River Thames Insurance Co. Ltd., Sovereign Marine & Gen. Ins. Co., Assicurazioni Generali S.P.A.,** Lloyd's Syndicate No. 447, **Phoenix "L" Account, Norwich Union Fire Insurance Society Ltd., Northern Assurance Company Limited,** Lloyd's Syndicate No. 202, Lloyd's Syndicate No. 745, Lloyd's Syndicate No. 735, Lloyd's Syndicate No. 725, Lloyd's Syndicate No. 697, **London & Hull Maritime Insurance Company Limited,** Lloyd's Syndicate No. 843, Lloyd's Syndicate No. 65, Lloyd's

Syndicate No. 831, Lloyd's Syndicate No. 803, Lloyd's Syndicate No. 80, Lloyd's Syndicate No. 633, Lloyd's Syndicate No. 483, Lloyd's Syndicate No. 455, Lloyd's Syndicate No. 625, Lloyd's Syndicate No. 62, Lloyd's Syndicate No. 575, Lloyd's Syndicate No. 535, And Lloyd's Syndicate No. 448, Defendants.

Docket No. 97–7982.

United States Court of Appeals, Second Circuit.

Argued May 18, 1998.

Decided Feb. 25, 1999.

Daniel P. Levitt, New York, New York (Franklin M. Sachs, H. Richard Chattman, Marianne C. Tolomeo, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, New Jersey, of counsel), for Defendant–Appellant.

Henry L. Goodman, Zalkin, Rodin & Goodman, New York, New York (Menachem O. Zelmanovitz, Michael S. Davis, Margot B. Schonholtz, Wendy S. Walker, Steven F. Capace, Mark E. Segall, Caroline A. Mellusi, of counsel), for Plaintiff–Appellee Chemical Bank (now The Chase Manhattan Bank).

David G. Keyko, Winthrop, Stimson, Putnam & Roberts, New York, New York (Valerie Fitch, of counsel), for Plaintiff–Appellee American Express Bank Ltd.

John M. Toriello, Haight, Gardner, Holland & Knight, New York, New York (Glenn J. Winuk, of counsel), for Plaintiffs–Appellees European American Bank, Bank Paribas and Rabobank Nederland.

Robert S. Fischler, Winston & Strawn, New York, New York (Edwin Larkin, of counsel), for Plaintiff–Appellee NatWest Bank, N.A. (now Fleet Bank, N.A.).

Lloyd D. Feld, New York, New York, for Consolidated Plaintiffs–Appellees Andina Coffee, Inc. and Andina Trading Corp.

Stanley N. Futterman, New York, New York (Craig A. Berrington, Phillip L. Schwartz, Washington, D.C., of counsel), for Amicus Curiae American Insurance Association.

Before: WINTER, Chief Judge, CARDAMONE, Circuit Judge, and CARMAN,* Judge.

WINTER, Chief Judge:

Affiliated FM Insurance Co. ("Affiliated") appeals from a judgment, entered after a bench trial before Judge Pollack, awarding Chemical Bank and five other banks (collectively, the "Banks")[1] approximately $47 million in damages and $45 million in prejudgment interest. The award was made under a maritime open cargo insurance policy issued by Affiliated to Andina Coffee, Inc. ("Andina"), a New York-based coffee importer. The policy named the Banks as additional insureds. *See Chemical Bank v. Affiliated FM Ins. Co.*, 970 F.Supp. 306, 312 (S.D.N.Y.1997). For the reasons that follow, we conclude that the policy had been validly terminated at the time of the losses and accordingly reverse with instructions to enter judgment for Affiliated.

## BACKGROUND

The present dispute arose from the presentation of fraudulent draw documents to the Banks in 1986 by several Colombian export businesses owned by the Echiverri family. The Echiverri family's companies (the "Echiverri Group" or the "Group") were collectively one of the two largest privately-owned coffee exporters in Colombia. In 1974, the Group, along with four other coffee exporters, established New York-based Andina to act as the exporters' financing agent in the United States. By 1982, Andina was owned entirely by the Echiverri Group and was the Group's exclusive sales agent.

Typically, the Group would begin a commercial cycle by contracting with an Ameri-

---

* The Honorable Gregory W. Carman, Chief Judge of the United States Court of International Trade, sitting by designation.

1. The Banks are Chemical Bank, European American Bank, Banque Paribas, American Express Bank Ltd., NatWest Bank National Association, and Rabobank Nederland. Chemical Bank is now known as The Chase Manhattan Bank and NatWest Bank, N.A. is now Fleet Bank, N.A.

can roaster for the sale and purchase of coffee. The Group would then inform Andina of the contract, and Andina would open a letter of credit in the Group's favor with one of the Banks. Once the Group had obtained and processed the coffee in Colombia, it would release the coffee to a trucker who would issue a truck bill of lading ("TBOL")— a commercial invoice that would, when presented to the Bank issuing the relevant letter of credit, allow the Group to draw upon the letter of credit. When the Group drew upon the letter of credit, Andina would incur a loan chargeable against its line of credit with the particular Bank. Andina would then arrange for the coffee to clear customs in the United States, deliver it to the customer, and collect payment. Andina would use the proceeds from the sale to repay the corresponding loan. This arrangement ran smoothly until 1986. *See Chemical Bank,* 970 F.Supp. at 311.

In July 1980, Andina purchased through Trinder & Norwood ("T & N"), Andina's longtime general insurance broker, a marine open cargo insurance policy issued by Affiliated (the "Affiliated Policy" or "Policy"). The Affiliated Policy generally covered goods lost in shipment. However, the so-called FBOL clause—"FBOL" being the acronym for "fraudulent bills of lading"—also provided coverage for "loss or damage occasioned through the acceptance by [Andina] and/or their agents or shippers of fraudulent Bills of Lading." The Affiliated Policy required Affiliated to provide Andina with 90 days' written notice of cancellation.

As a condition of financing Andina's transactions with the Echiverri Group, the Banks required Andina to procure suitable insurance coverage for itself and to add the Banks to the policy. *See Chemical Bank,* 970 F.Supp. at 321–22. Accordingly, Andina directed T & N to add each Bank to the Affiliated Policy as an additional insured.

Each Banker's endorsement recited in pertinent portion that:

> This insurance, as to the interest of the Bank, shall not be impaired nor invalidated by any act or neglect of the named Assured [i.e., Andina] nor by failure to comply with any warranty or condition over which the Bank has no control; and this policy shall not be cancelled nor materially changed as to the interest of the Bank unless 10 days' ... prior written notice of such change or cancellation shall have been given to the Bank.[2]

In the summer of 1985, Affiliated advised T & N that it wished to cancel the Policy. On November 27, 1985, Affiliated gave T & N written notice of cancellation of the Policy effective March 1, 1986. T & N, fearing that an insurer's unilateral cancellation would make it difficult for Andina to secure substitute coverage, successfully persuaded Affiliated in December 1985 to rescind its notice of cancellation. In exchange for that rescission, T & N—at Andina's direction—promised to obtain replacement insurance as soon as possible and to inform Affiliated of the actual date of cancellation.

On or about February 25, 1986, T & N obtained from Hogg Robinson, a London broker, a cover note providing that a new policy (the "London Policy"), issued by certain Lloyd's syndicates and other insurance companies (collectively, the "London insurers"), was effective as of that date.[3] T & N immediately telexed both Affiliated and Andina to confirm that the Affiliated Policy was cancelled and replaced with the London Policy. T & N did not send a notice of cancellation to the Banks; William Fieldman, a T & N broker, testified that sending such notice is normally the responsibility of the insurer, a point that David A. Pemmerl, a manager for Affiliated, confirmed.[4] On March 11, 1986, Affiliated sent to the Banks a notice stating

---

2. Nothing in the record indicates that T & N added this clause to the Affiliated Policy at the request of the Banks. Insofar as the record sheds light on the contractual relationship between the Banks and Andina, it reveals only the Banks' desire that Andina and the Banks have unbroken insurance with suitable coverage.

3. No party claims that the coverage of the London Policy differed materially from the Affiliated Policy. William Fieldman, a broker with T & N, testified that the two policies were "on par" with one another.

4. Pemmerl maintained, however, that 10 days' advance notice was impossible because T & N chose the date of cancellation.

that the Affiliated Policy was cancelled as to all shipments made on or after February 25, 1986. No Bank voiced any objection to the termination of the Affiliated Policy as of that date, to the terms of the London Policy, or to the lack of prior notice of cancellation.

Because some shipments of coffee had purportedly been in transit in Colombia prior to February 25, 1986, but had not been shipped by that date, T & N encountered problems in allocating premium payments between the Affiliated and London Policies. On April 22, 1986, T & N agreed with Affiliated, Hogg Robinson, and the London insurers that the London Policy would be amended to cover all interior shipments made before February 25, 1986, except for those for which ocean bills of lading had already been issued. An endorsement embodying this agreement (the "April Agreement") was added to the London Policy, but no corresponding endorsement was added to the Affiliated Policy. No notice of the April agreement was given to the Banks.

Also in April, an increasing lag between the Echiverri Group's delivery of TBOLs to Andina and its shipment of coffee developed. Worse, in August 1986, the Banks and Andina learned that the coffee described in several TBOLs did not exist and that the Echiverri Group had been using the money drawn on the Banks' letters of credit to finance other debts.

Upon discovery of the fraud, each Bank provided Affiliated and the London insurers with written proofs of loss. With the excep-

tion of NatWest, which sent proofs of loss to all insurers for all periods of time, each Bank submitted claims against Affiliated for losses occurring before February 25, 1986, and against the London insurers for losses occurring on or after that date.[5] Both insurers refused to pay the claims. The London insurers asserted that the London Policy was void *ab initio* due to alleged placing errors and non-disclosure by T & N of the fact that Affiliated had sent a notice of cancellation in November 1985. *See Chemical Bank,* 970 F.Supp. at 324. Affiliated contended, *inter alia,* that the Affiliated Policy did not cover losses resulting from the acceptance of fraudulent TBOLs that described non-existent coffee. *See id.* at 329.

In 1987, the Banks sued T & N in New York state court. In these suits, the Banks alleged that T & N had been their broker during the term of the Affiliated Policy, had been the intermediary between them and Affiliated, and had acted on their behalf in undertaking to replace the Policy.[6] The Banks conceded in their complaints that the Affiliated Policy was terminated on February 25, 1986.[7] These suits were ultimately settled.

Also in 1987, five of the six Banks filed the now-consolidated suits in the Southern District against Affiliated and the London insurers.[8] Initially, the Banks' complaints asserted claims against Affiliated only for those losses that occurred before February 25, 1986. The complaints were amended in 1989

---

5. It was not until March 3, 1989, nearly two and a half years after the initial proofs of claims were filed, that any Bank (save for NatWest, which disregarded all dates, *see supra*) submitted proofs to Affiliated for losses occurring after February 25, 1986.

6. Each appellee/plaintiff Bank included the following assertion in its state court pleading on this matter. "Upon information and belief, during the term of the AFM [Affiliated] Policy, T & N continued *to act as the insurance broker for Andina and for and on behalf of [individual bank] and other banks* in connection with the maintenance and supervision of said policy and as an intermediary between the Assureds and the insurer, AFM." *See* Complaint, *American Express Bank LTD v. Trinder & Norwood Inc.,* Supreme Court of the State of New York County of New York; *Chemical Bank,* 970 F.Supp. 306, Trial Record E–3530, Paragraph 8, p. 3. (emphasis added).

7. Each appellee/plaintiff Bank included the following assertion in its state court pleading on this matter. "T & N never advised [individual bank] or Andina that the AFM [Affiliated] Policy did not remain in force from the date of its inception on or about July 23, 1980, *up to and including on or about February 25, 1986, when the AFM Policy was terminated.*" *See* Complaint, *American Express Bank LTD v. Trinder & Norwood Inc.,* Supreme Court of the State of New York County of New York; *Chemical Bank,* 970 F.Supp. 306, Trial Record E–3530, Paragraph 7, p. 3. (emphasis added).

8. The sixth Bank, European American Bank, filed suit in 1989 and asserted claims only against Affiliated.

to allege that the Affiliated Policy covered post-February 25 shipments because Affiliated had failed to adhere to the 10–day notice-of-cancellation provision in the Policy. Five of the Banks also asserted claims against Hogg Robinson. Each of these complaints alleged that T & N had been the Banks' broker and that the London Policy was in place and was binding on the London insurers. These actions were later consolidated and assigned to Judge Broderick, who made several pretrial rulings, including a determination that the FBOL clause covered purported shipments of nonexistent coffee. *See Chemical Bank v. Affiliated FM Ins. Co.,* 815 F.Supp. 115 (S.D.N.Y.1993). Eventually, all claims against the London insurers and Hogg Robinson were settled, and the case was reassigned to Judge Pollack.

A bench trial was held in May and June 1997. The district court held that: (i) T & N, by agreement with Affiliated and the London insurers, purported to cancel the Affiliated Policy as of February 25, 1986, and replace it with the London Policy, *see Chemical Bank,* 970 F.Supp. at 312, 325; (ii) the London Policy became effective as of that date, *see id.* at 326; (iii) as to Andina, the Affiliated Policy was terminated on that date, *see id.* at 330; but (iv) as to the Banks, the Affiliated Policy was not terminated until March 21, 1986, ten days after Affiliated sent notice of the cancellation to the Banks, *see id.* at 322, 325, 330.

As to the conclusion that coverage of the Banks under the Affiliated Policy terminated only on March 21, 1986, the district court reasoned that each Bank was contractually entitled to 10 days' prior notice of cancellation; that T & N had no actual or apparent authority to waive that provision on behalf of the Banks, *see id.* at 330; and that, because T & N had not "purported" to act on behalf of the Banks with respect to cancellation or replacement of the Affiliated Policy and because no Bank knew that the London insurers would later assert that the London Policy was void, the Banks did not ratify any such

waiver of notice, *see id.* at 330–31. Finally, the district court found that the so-called April Agreement was ineffective because the Banks were never told of it. *See id.* at 331. Because each loss claimed by the Banks related to purported shipments occurring on or before March 21, 1986, the district court concluded that the Affiliated Policy covered each such loss. *See id.* Accordingly, the court entered judgment for the Banks.

## DISCUSSION

Affiliated makes several claims of error on appeal, but the dispositive issue is whether the Banks are bound by T & N's cancellation and replacement of the Affiliated Policy on February 25, 1986, and by T & N's subsequent April Agreement allocating the respective liabilities under the Affiliated and London Policies.

In addressing these questions, it is important to define the issues that are not seriously disputed. T & N was clearly the Banks' agent in obtaining and maintaining the Affiliated Policy.[9] Indeed, the major premise of the $92 million judgment for the Banks entered in the present action is that T & N obtained from Affiliated an insurance policy enforceable by the Banks. In fact, the only party with whom Affiliated ever dealt regarding coverage of the Banks was T & N.

T & N's authority was derived from Andina. The Banks required that Andina purchase insurance for itself and for them.[10] By any standard, that made Andina the Banks' agent for the purpose of obtaining and maintaining unbroken insurance coverage for the Banks. The only limits on Andina's authority in the record were the endorsements quoted above that contained the 10–day notice provision. Apart from those endorsements, T & N had no notice of any limits on Andina's authority. Morever, while the Banks were additional insureds, it was Andina that paid the premia, and the Banks' coverage under the Affiliated Policy was maintained at

---

**9.** *See supra* notes 6 and 7.

**10.** There is no evidence in the record concerning the terms of the agreement between Andina and the Banks under which Andina agreed to procure

insurance. Specifically, there is no evidence that Andina and the Banks bargained for the 10 days' notice provision.

all times only at Andina's direction, save again for the protection of the endorsements.

It follows that, when Affiliated sought in 1985 to terminate the Policy, it was seeking to end coverage as to both Andina and the Banks. They were covered by the same Policy and termination of the Policy would by definition end that coverage. In December 1985, when T & N, on Andina's behalf, asked Affiliated to withdraw the cancellation notice in return for T & N's promise to secure substitute insurance, the request for withdrawal, to be effective, also had to include, and be understood by Affiliated to include, Affiliated's forbearance with regard to the Banks' coverage. It would hardly have met Andina's, T & N's, or the Banks' needs in December 1985 to have the cancellation notice to Andina withdrawn only to have Affiliated the next day give the requisite 10 days' notice cancelling the Banks' coverage. Nor, indeed, can the Banks credibly argue—and they do not—that T & N's implied request for forbearance with regard to the Banks was beyond T & N's authority as derived from Andina. It was a critical element of Andina's contractual obligation to the Banks to provide for them—and itself—unbroken insurance coverage. Preventing cancellation absent substitute coverage was integral to the obligation to obtain insurance in the first place.

It is also clear that when, on February 25, 1986, T & N agreed with Affiliated and the London insurers that the Affiliated Policy would be terminated as of that date and replaced by the London Policy, T & N was acting on behalf of and within the scope of authority conferred on it by Andina. Accordingly, the Affiliated Policy was terminated as to Andina on February 25, 1986, notwithstanding Andina's right under the Policy to 90 days' notice of cancellation.

The factual statements in the above discussion are fully consistent with the findings of the district court. There is one finding of the court, however, that we hold to be clearly erroneous.[11] Finding No. 66 states that "[t]here is no evidence that T & N purported to cancel the Affiliated Policy [on February 25, 1986] on behalf of any Bank." To the extent that this finding suggests that T & N did not intend to terminate the Policy as to the Banks on February 25, 1986, it is simply wrong. The cancellation was not at T & N's instance but at Affiliated's. Affiliated had communicated its desire to T & N to cancel the entire Policy, which covered both Andina and the Banks. Neither Affiliated, Andina, nor T & N ever suggested that the cancellation would not end all coverage of all insureds. Because the coverage was for the same risks arising out of the same transactions, a partial cancellation would have made no commercial sense. Moreover, all parties understood that no premia would be paid to cover Andina or the Banks for the period from February 25 on. Indeed, the April Agreement was executed to allocate risks with that date in mind. Finally, T & N obtained substitute coverage for the Banks from the London insurers effective on that date, an act confirming T & N's intent to terminate Affiliated's coverage of the Banks.

■ We turn then to the core of the case, namely, whether the February 25 termination was effective as to the Banks and whether the April Agreement binds the Banks.[12] We hold for Affiliated on both issues.

---

11. Because we decide this case upon ratification grounds, we need not hold Finding No. 67 to be clearly erroneous and thus do not reach that issue. We need not hold Finding No. 26 to be clearly erroneous because that portion thereof that addresses the date of cancellation of the Affiliated Policy is not a finding of fact but a conclusion of law.

12. Parties may of course waive notice of cancellation requirements in an insurance policy. Generally, where a party wishes to terminate an insurance policy before its expiration, the party must strictly follow the cancellation terms of that policy. See *Providence Washington Ins. Co. v.* *Security Mut. Ins. Co.*, 35 N.Y.2d 583, 364 N.Y.S.2d 479, 324 N.E.2d 134, 136 (1974) (per curiam); *National Factors, Inc. v. Waters*, 42 Misc.2d 822, 249 N.Y.S.2d 121, 127 (1964). It is settled under New York law, however, that the parties can agree to waive terms of the policy, including the terms governing notice of cancellation. See, e.g., *Sass v. Ocasio*, 59 A.D.2d 859, 399 N.Y.S.2d 122, 123 (1977); see also 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 31:52 (1997). In the instant matter, T & N and Affiliated agreed to waive the notice provisions and there is no dispute that Andina gave T & N the express authority to replace the Affiliated

Affiliated advances a strong argument that we should simply dispose of both issues under the doctrine of apparent authority. The Banks authorized Andina to procure and pay for insurance on their behalf. *See Doxsee Sea Clam Co. v. Brown,* 13 F.3d 550, 553 (2d Cir.1994) ("An agent has apparent authority when conduct by the principal leads a third party to believe that the agent has authorization to act on behalf of the principal."). The Banks never communicated to Affiliated any limitations on that authority. When Affiliated wanted to terminate the Policy, T & N asked on Andina's behalf that Affiliated withdraw its notice of cancellation. That request was reasonably understood to include a request for forbearance by Affiliated regarding coverage of the Banks. In return, Andina and T & N promised to obtain substitute insurance as quickly as possible and to inform Affiliated of the effective date of the new insurance. Affiliated's forbearance as to the Banks involved a sacrifice of a legal right because it could have terminated their coverage at any time on only 10 days' notice. *See Monarch Ins. Co. of Ohio v. Insurance Co. of Ireland Ltd.,* 835 F.2d 32, 36 (2d Cir.1987). When T & N informed Affiliated that a new policy was effective immediately on February 25, 1986, Affiliated reasonably believed that Andina had fulfilled its contractual obligations to the Banks and was acting within its authority in terminating the Affiliated Policy on that day.

We dispose of the case on slightly narrower but stronger grounds, however. The Banks clearly ratified the February 25th termination. That ratification in turn, along with all other conduct, renders the April Agreement binding on the Banks under the doctrine of apparent authority.

■ Under New York law, ratification is the affirmance by a party of a prior act that did not bind it at the time but that was done or purportedly done on its account. *See J.M. Heinike Assocs., Inc. v. Chili Lumber Co.,* 83 A.D.2d 751, 443 N.Y.S.2d 512, 513 (1981); *Leviten v. Bickley, Mandeville & Wimple,* 35

F.2d 825, 827 (2d Cir.1929); *Restatement (Second) of Agency* § 82 (1958). Ratification "must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Holm v. C.M.P. Sheet Metal, Inc.,* 89 A.D.2d 229, 455 N.Y.S.2d 429, 432 (1982); *accord Restatement (Second) of Agency* §§ 91, 93. However, "[t]he intent can be 'implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events.'" *Monarch Ins. Co.,* 835 F.2d at 36 (quoting *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds,* 407 F.2d 521 (2d Cir.1969)). A ratified act is given effect as if originally authorized. *See Holm,* 455 N.Y.S.2d at 432.

■ The Banks received notice on March 11, 1986, that the Affiliated Policy had been terminated on February 25, 1986. Although this notice would surely have caught the attention of any insured who needed prior warning—and prompted a swift protest—the Banks never objected to or questioned the validity of the termination, at least until they discovered years later that it was in their litigation interests to do so. Under the circumstances, the Banks' silence in the face of this cancellation notice amounted to an implied affirmance of the cancellation on February 25, 1986. *See Restatement (Second) of Agency* § 94 (affirmance can be inferred from failure to repudiate unauthorized transaction); *see also J.M. Heinike Assocs., Inc.,* 443 N.Y.S.2d at 513 ("[A]ffirmance may be inferred from silence when, in the normal course of affairs, one who does not wish to consent would speak out."); *American Anchor & Chain Corp. v. United States,* 166 Ct.Cl. 1, 331 F.2d 860, 865 (1964) (principal ratified act of purported agent by failing to

Policy with the London Policy. This authority included the power to waive Andina's contractual right to 90 days' notice. *See, e.g., Dudley v. Perkins,* 235 N.Y. 448, 139 N.E. 570, 572 (1923) (grant of authority necessarily encompasses all

acts "ordinarily incidental to the exercise" of the authority); *see also Rose Inn Corp. v. National Union Fire Ins. Co.,* 258 N.Y. 51, 179 N.E. 256, 256 (1932).

repudiate); *cf. Carter v. Allstate Indem. Co.*, 592 So.2d 66, 71–73 (Miss.1991) (even though insurer did not provide mortgagee with 10 days' notice of cancellation, mortgagee estopped from making claim against insurer because mortgagee acquiesced in placement of substitute insurance with another insurer); *Julien J. Studley, Inc.*, 282 F.Supp. at 752 (principal may be estopped to deny ratification where he fails to timely repudiate and other party performs in reliance); Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 37 (2d ed.1990) (principal who fails to repudiate and retains benefits of Agreement estopped to deny ratification).

We do not stretch logic in so concluding. When the Banks received the March 11, 1986 notice, their sole interest in these transactions was in unbroken insurance coverage. Indeed, the 10 days' notice provision was obviously intended to protect the Banks from a gap in coverage should Andina fail in its contractual obligations to maintain insurance. With substitute insurance in place, the Banks had no reason to question the termination. In fact, in their state-court complaints, the Banks acknowledged that the Affiliated Policy terminated on February 25, 1986. Further, the Banks (save NatWest) never submitted to Affiliated proofs of loss for shipments occurring after February 25, 1986, until March 1989.

Relying on Finding No. 66, the district court held that any affirmance of T & N's acts did not amount to ratification because T & N, in cancelling and replacing the Affiliated Policy, did not do so with respect to the Banks. In its view, "there was no unauthorized act which could be the subject of a subsequent ratification by any Bank." 970 F.Supp. at 330. However, for reasons set out at length above, Andina and T & N both intended that coverage of the Banks under the Affiliated Policy would cease when the London Policy became effective.

The Banks also contend that they could not have effectively ratified the cancellation of the Affiliated Policy because they were unaware of two material facts—that losses had occurred shortly after the cancellation and that the London insurers would later claim that the London Policy was void. We disagree. Such facts are not material.

The fact of prior losses was not, under the circumstances, material. T & N cancelled the Affiliated Policy but simultaneously replaced it with a policy with identical coverage. Therefore, even if the Banks had known that losses had occurred after the cancellation but before the subsequent ratification, the Banks would have had every reason to believe that they were covered under the London Policy, and knowledge of the losses would not have affected their decision whether to ratify the replacement.

The actions of the London insurers in claiming that the London Policy was void were also not material for purposes of ratification doctrine. The future actions of an insurer are not facts of which a party can be informed when deciding whether to acquiesce in the early cancellation of another policy. There is always a risk that an insurer will refuse to honor a future claim. However, whether conduct amounts to ratification depends on circumstances at the time of the conduct, not the *ex post* actions of a substitute insurer. Otherwise, a ratification would be effective only when things turned out well for the principal, a circumstance in which the ratification would be irrelevant.

 With regard to the April Agreement, the Banks did not receive notice of it, and the doctrine of ratification cannot apply. However, we believe that T & N had apparent authority to enter into it. Apparent authority is generally defined as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of Agency* § 8. "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Ben–Reuven v. Kidder, Peabody & Co.*, 241 A.D.2d 504, 661 N.Y.S.2d 28, 29 (1997) (quoting *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 656 N.Y.S.2d 188, 678 N.E.2d 874, 877 (1997)); *accord Doxsee Sea Clam Co.*, 13 F.3d at 553–

54. The existence of apparent authority depends on some conduct by the principal "which reasonably give[s] the appearance that the agent has authority to conduct a particular transaction." *Doxsee Sea Clam Co.*, 13 F.3d at 554 (citing *Greene v. Hellman*, 51 N.Y.2d 197, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980)); *accord Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178, 1181 (1984). Where a third party reasonably relies on such acts, the principal may be bound by the conduct of his agent. *Doxsee Sea Clam Co.*, 13 F.3d at 554.

■ To be sure, the Banks never communicated directly with Affiliated. However, under New York law, apparent authority does not require actual contact between the principal, here the Banks, and the third party, here Affiliated. *See General Motors Acceptance Corp. v. Finnegan*, 156 Misc.2d 253, 592 N.Y.S.2d 570, 572 (1992). Rather, it requires the third party only to demonstrate some manifestation attributable to the principal. Were the law otherwise, the benefits of the doctrine of apparent authority would be severely diminished because a lack of contact between the principal and third party often leaves the third party with little choice but to deal with the purported agent.

The manifestation giving rise to T & N's apparent authority in the instant matter arises from the facts that: (i) the Banks allowed T & N (through Andina) to set the terms of their initial inclusion as additional insureds to the Affiliated Policy; (ii) the Banks for years ceded to T & N the power to maintain that Policy and, save for the endorsement, never indicated to Affiliated that T & N's authority was limited; indeed, they never communicated with Affiliated concerning the Policy; and (iii) the Banks, as discussed above, ratified by their silence the cancellation and replacement of the Affiliated Policy, indicating that the Banks' sole interest was in the maintaining of unbroken coverage and necessitating the clarification of risk allocation and premia division that the April Agreement represented.

Based on these facts, it was reasonable as a matter of law for Affiliated to believe that, where the substitution of a new policy created ambiguity over the matching of liability for premia and allocation of risk, T & N had the authority on behalf of the Banks to enter into an agreement drawing a bright line even if some reallocation of the risks between the Affiliated and London Policies was involved. *See, e.g., Fitzgibbon v. Abatelli Real Estate*, 214 A.D.2d 642, 625 N.Y.S.2d 276, 277 (1995) (apparent authority is outgrowth of equitable principle that, as between two innocent persons, person who enabled the injury to occur should bear loss); *see also Hallock*, 485 N.Y.S.2d 510, 474 N.E.2d at 1182 (attorney had, as a matter of law, apparent authority to enter into settlement where he had represented client in prior settlement negotiations and appeared at final pretrial conference where settlement was reached); *cf. Jones v. Nunley*, 274 Or. 591, 547 P.2d 616, 618 (1976) (purported agent did not have apparent authority where principal, not agent, had engaged in prior negotiations with third party).

The April Agreement merely allocated risks between two insurance policies that T & N had undeniable authority to purchase. The Agreement did not result in a break or reduction or coverage of the Banks, and it would have seemed to a reasonable person at the time to have been very much in the Banks' interests to have the allocation of risk clarified lest a dispute between insurers retard or prevent recovery for claims. It is only in the hindsight of this litigation with its unique facts that we know otherwise.

We expressly note that this case is entirely distinguishable from one where, in similar circumstances, an apparent agent and third party agree to cancel the principal's interest in a policy without providing the required notice or substitute insurance. It surely would have been unreasonable for Affiliated to assume that T & N could waive the 10–day notice period without engaging another insurer. *See Van Arsdale v. Metropolitan Title Guar. Co.*, 103 Misc.2d 104, 425 N.Y.S.2d 482, 484 (Dist.Ct.1980).

## CONCLUSION

The judgment of the district court is reversed with instructions to enter judgment for Affiliated.